1  MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
   Harvey I. Saferstein, Esq. (SBN: 49750)
2  Nada I. Shamonki, Esq. (SBN: 205359)
   2029 Century Park East, Suite 1370
3  Los Angeles, California 90067
   Phone: 310.586.3200
4  Fax: 310.586.3202
   hsaferstein@mintz.com; nshamonki@mintz.com
5
   Attorneys for Defendants
6  SCOTT N. FLANDERS, THOMAS W. BASSETT,
   WILLIAM F. BAKER, RAYMOND C.H. BRYAN,
7  ROBIN J. HARDIE, BURL OSBORNE,
   DAVID M. TOLLEY, MICHAEL J. DOMINGUEZ,
8  MARK J. MASIELLO, DAVID D. THRESHIE,
   MARK T. GALLOGLY, JILL A. GREENTHAL,
9  JAMES J. SPANFELLER, CHRIS PHILIBBOSIAN,
   GREGORY J. WALLACE
10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                 SANTA ANA DIVISION

14                              SACV10-789 AG (MLGx)

15  JAMES SKORHEIM, as Litigation      Case No.
    Trustee for the FCH Litigation Trust,
16
17              Plaintiffs,            NOTICE OF REMOVAL OF
                                       ACTION PURSUANT TO
18    vs.                             28 U.S.C. §§ 1441 AND 1452(a)

19  SCOTT N. FLANDERS, an individual;
    THOMAS W. BASSETT, an
20  individual; WILLIAM F. BAKER, an
    individual; RAYMOND C.H. BRYAN,
21  an individual; ROBIN J. HARDIE, an
    individual; BURL OSBORNE, an
22  individual; DAVID M. TOLLEY, an
    individual; MICHAEL J.
23  DOMINGUEZ, an individual; MARK
    J. MASIELLO, an individual; DAVID
24  D. THRESHIE, an individual; MARK
    T. GALLOGLY, an individual; JILL A.
25  GREENTHAL, an individual; JAMES
    J. SPANFELLER, an individual;
26  CHRIS PHILIBBOSIAN, an individual;
    GREGORY J. WALLACE, an
27  individual; and DOES 1 through 25,
    inclusive,
28
                Defendants.

                        1

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that defendants Scott N. Flanders, Thomas W. Bassett, William F. Baker, Raymond C.H. Bryan, Robin J. Hardie, Burl Osborne, David M. Tolley, Michael J. Dominguez, Mark J. Masiello, David D. Threshie, Mark T. Gallogly, Jill A. Greenthal, James J. Spanfeller, Chris Philibbosian, and Gregory J. Wallace (the "Defendants") hereby remove this case entitled *James Skorheim, as Litigation Trustee for the FCH Litigation Trust v. Flanders et al.* (the "Action"), from the Superior Court of California, County of Orange, to the United States District Court for the Central District of California, pursuant to 28 U.S.C. §§ 1441 and 1452(a).

In support of this Notice of Removal, Defendants allege:

1. On or about September 1, 2009, Freedom Communications Holdings, Inc. and its affiliated entities (the "Debtors"[1/]) filed voluntary petitions for bankruptcy relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), jointly administered under Case No. 09-13046 (BLS).

2. On or about March 9, 2010, the Delaware Bankruptcy Court confirmed the Debtors' Joint Plan of Reorganization (the "Plan"). The FCH Litigation Trust was established pursuant to the Plan and James Skorheim subsequently was named as the "Litigation Trustee."

3. On or about May 5, 2010, the Litigation Trustee commenced the Action to prosecute the transferred causes of actions against the Defendants alleging, among other things, breaches of fiduciary duty against the Defendants for (1) failure to preserve certain preference claims under the 11 U.S.C. § 547; (2) failure to preserve certain fraudulent conveyance claims pursuant to 11 U.S.C § 544; and (3) the

---

[1/]   Freedom Communications, Inc., among others, was also a debtor in the bankruptcy proceeding.

2

1 | Debtors' alleged failure to petition the company into bankruptcy before September,
2 | 2009.

3 |     4.    This Court has jurisdiction over the Action pursuant to 28 U.S.C.
4 | § 1331, which gives the federal district courts "original jurisdiction of all civil actions
5 | arising under the . . . laws. . . of the United States."  The FCH Litigation Trust's
6 | claims arise under the laws of the United States because they seek relief from certain
7 | preference and fraudulent conveyance actions pursuant to the federal bankruptcy
8 | code.

9 |     5.    This Court also has jurisdiction over the Action pursuant to 28 U.S.C.
10 | § 1452(a), whereby "a party may remove any claim or cause of action in a civil action
11 | . . . to the district court for the district where such civil action is pending, if such
12 | district court has jurisdiction of such claim or cause of action under section 1334 of
13 | this title."  This Court has jurisdiction over the Action pursuant to 28 U.S.C.
14 | § 1334(b) because it is a proceeding arising under title 11, or arising in or related to a
15 | case under title 11.  The Action also is a core proceeding under 28 U.S.C. § 157(b)
16 | (2) (F), (H) and (O).

17 |     6.    Exhibit A contains all process, pleadings, and orders served upon
18 | Defendants in the Action.

19 |     7.    A copy of this Notice of Removal will promptly be served upon all
20 | parties and filed with the Clerk of the Superior Court of California, County of
21 | Orange, in accordance with 28 U.S.C. § 1446(d).
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

1    WHEREFORE, Defendants respectfully request that this case proceed as an

2  action properly removed hereto.

3

4  Dated:  June 7, 2010                              Respectfully submitted,

5
                                                     MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
6                                                    AND POPEO, PC

7

8

9                                                    Harvey I. Saferstein
                                                     Nada I. Shamonki
10
                                                     *Attorneys for Defendants*
11                                                   *Scott N. Flanders, Thomas W. Bassett, William*
                                                     *F. Baker, Raymond C.H. Bryan, Robin J.*
12                                                   *Hardie, Burl Osborne, David M. Tolley,*
                                                     *Michael J. Dominguez, Mark J. Masiello,*
13                                                   *David D. Threshie, Mark T. Gallogly, Jill A.*
                                                     *Greenthal, James J. Spanfeller, Chris*
14                                                   *Philibbosian, Gregory J. Wallace*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:** SCOTT N. FLANDERS, an individual; THOMAS W. BASSETT, an
*(AVISO AL DEMANDADO):* individual; WILLIAM F. BAKER, an individual; RAYMOND C.H.
BRYAN, an individual; ROBIN J. HARDIE, an individual; BURL OSBORNE, an individual; DAVID M.
TOLLEY, an individual; MICHAEL J. DOMINGUEZ, an individual; MARK J. MASIELLO, an individual;
DAVID D. THRESHIE, an individual; MARK T. GALLOGLY, an individual; JILL A. GREENTHAL, an
individual; JAMES J. SPANFELLER, an individual; CHRIS PHILIBBOSIAN, an individual; GREGORY J.
WALLACE, an individual; and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAMES SKORHEIM, as Litigation Trustee for the FCH
Litigation Trust

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

# FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**MAY 05 2010**

ALAN CARLSON, Clerk of the Court

BY _____ J. HAINES _____, DEPUTY

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Orange County Superior Court<br>~~700 Civic Center Drive West~~<br>Santa Ana, CA 92701 | CASE NUMBER:<br>*(Número del Caso):*<br>**30-2010 00369301** |

Clerk of the Superior Court
Civil Complex Center
751 W. Santa Ana Blvd.
Santa Ana, Ca 92701

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel J. Callahan, Esq.
Callahan & Blaine, APLC
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707

**JUDGE NANCY WIEBEN STOCK
DEPT. CX105**

(714) 241-4444  (714) 241-4445

**J. HAINES**

DATE:           **MAY 05 2010**          **ALAN CARLSON**, Clerk, by _____, Deputy
*(Fecha)*                                              *(Secretario)*                                                        *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**


Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

5

Exhibit A

1    **CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
2    Brian J. McCormack (Bar No. 167547)
David J. Darnell (Bar No. 210166)
3    3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
4    (714) 241-4444
(714) 241-4445 Fax
5

Attorneys for Plaintiff JAMES SKORHEIM,
6    as Litigation Trustee for the FCH Litigation Trust

7

8             **SUPERIOR COURT OF CALIFORNIA**

9       **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**MAY 05 2010**

ALAN CARLSON, Clerk of the Court

BY _____ J. HAINES _____, DEPUTY

10                                   **30-2010**

| | |
|---|---|
| 11   JAMES SKORHEIM, as Litigation Trustee for the FCH Litigation Trust, | **CASE NO.**    **0 0 3 6 9 3 0 1** |
| 12            Plaintiff, | Assigned For All Purposes To: Honorable |
| 13   v. | Department: **JUDGE NANCY WIEBEN STOCK** |
| 14   SCOTT N. FLANDERS, an individual; | **DEPT. CX105** |
| 15   THOMAS W. BASSETT, an individual; WILLIAM F. BAKER, an individual; | **COMPLAINT FOR:** |
| 16   RAYMOND C.H. BRYAN, an individual; ROBIN J. HARDIE, an individual; BURL | 1. Illegal Dividend and Unlawful Distribution |
| 17   OSBORNE, an individual; DAVID M. TOLLEY, an individual; MICHAEL J. | 2. Illegal Dividend and Unlawful Distribution |
| 18   DOMINGUEZ, an individual; MARK J. MASIELLO, an individual; DAVID D. | 3. Illegal Dividend and Unlawful Distribution |
| 19   THRESHIE, an individual; MARK T. GALLOGLY, an individual; JILL A. | 4. Breach of Fiduciary Duty |
| 20   GREENTHAL, an individual; JAMES J. SPANFELLER, an individual; CHRIS | 5. Illegal Dividend and Unlawful Distribution |
| 21   PHILIBBOSIAN, an individual; GREGORY J. WALLACE, an individual; and DOES 1 | 6. Negligence |
| 22   through 25, inclusive, | 7. Breach of Fiduciary Duty |
| 23            Defendants. | 8. Negligence |

CASE NO.   **0 0 3 6 9 3 0 1**

Assigned For All Purposes To:
Honorable
Department: **JUDGE NANCY WIEBEN STOCK**
                 **DEPT. CX105**

**COMPLAINT FOR:**

1. Illegal Dividend and Unlawful Distribution
2. Illegal Dividend and Unlawful Distribution
3. Illegal Dividend and Unlawful Distribution
4. Breach of Fiduciary Duty
5. Illegal Dividend and Unlawful Distribution
6. Negligence
7. Breach of Fiduciary Duty
8. Negligence
9. Illegal Dividend and Unlawful Distribution
10. Breach of Fiduciary Duty
11. Negligence
12. Breach of Fiduciary Duty
13. Breach of Fiduciary Duty
14. Breach of Fiduciary Duty
15. Breach of Fiduciary Duty

**Unlimited Jurisdiction**

**DEMAND FOR JURY TRIAL**

27         THIS CASE IS SUBJECT TO
MANDATORY ELECTRONIC FILING
PURSUANT TO RULE 308 OF THE LOCAL RULES
28   OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

COMPLAINT

1    Plaintiff JAMES SKORHEIM, as Litigation Trustee of the FCH Litigation Trust, complains

2    and alleges on information and belief as follows:

3    **I.    INTRODUCTION**

4    1.    It is axiomatic that directors of an insolvent company have an unequivocal fiduciary

5    duty to manage the company for the benefit of its unsecured creditors, not its shareholders.  This duty

6    cannot be abrogated, and includes the basic obligations of good faith, loyalty, and due care.  Indeed, it

7    has been said that fiduciary duties require "the punctilio of an honor the most sensitive" and do "not

8    operate intermittently but [are] the constant compass by which all director actions for the corporation

9    must be guided."  This action concerns repeated and continuous breaches of these duties by a group of

10   directors that pursued a singular devotion to secure funds for equity holders and utterly failed to adhere

11   to their obligations of good faith, loyalty, and due care.

12   2.    As set forth herein, the directors of Freedom Communications Holdings, Inc. and

13   Freedom Communications, Inc. (together, the "Company"), who are defendants in this action,

14   flagrantly disregarded their fiduciary duties to the Company and its creditors during a period of time

15   when the Company was hopelessly insolvent by squandering hundreds of millions of dollars of

16   Company assets in a high-stakes gamble for a minimal recovery for equity.  By this action, the trustee

17   charged with bringing Company claims seeks to provide meaningful redress to the Company and its

18   unpaid creditors for the directors' breaches of their fiduciary duties and other wrongful acts.

19   3.    The trouble began in mid-2004 when certain family members (the Company was wholly

20   owned by the Hoiles family at this time) wanted to cash out their interests, while others were

21   committed to retaining control over the Company as the family had for nearly seventy years.  The

22   family members resolved the dispute by causing the Company to enter into a transaction that allowed

23   those shareholders that wished to cash out to receive payments of over $960 million while providing

24   those that retained their shares with the opportunity to maintain control of the Company without

25   putting in any additional capital.  These twin objectives were seemingly achieved by selling

26   approximately 40% of the Company stock to The Blackstone Group and Providence Equity Partners,

27   Inc. for $467 million and saddling the Company with an astronomical $900 million in new debt.

28

COMPLAINT

1      4.     The Company received no value from the 2004 shareholder cash out and was so

2  severely leveraged at its conclusion that it had been rendered insolvent and left with unreasonably

3  small capital to adapt to economic change.  Without regard for the Company's precarious financial

4  state or their fiduciary duties to the corporate entity, the directors continued to operate the Company in

5  blind devotion to and for the benefit of out-of-the money shareholders.  Indeed, from the last two

6  quarters of 2004 through the first quarter of 2008, the directors declared and distributed, as a matter of

7  course, tens of millions of dollars in illegal dividends.  These dividend payments further reduced the

8  Company's already unreasonably small capital and left the Company with no flexibility to evolve and

9  adapt to a changing marketplace or withstand any significant downturn in business, which the

10  Company began to experience in 2007.

11      5.     By early 2008, the directors could no longer ignore the fact that the Company was in

12  financial crisis and debt covenant defaults were imminent.  In the context of doing everything they

13  could to prevent a covenant default from occurring in June of 2008, the directors finally ceased paying

14  dividends (although they had improperly approved the first quarter dividend as a matter of course).

15  Nevertheless, demonstrating their continued devotion to securing some recovery for out of the money

16  shareholders, however, the directors refused to cause the Company to file for bankruptcy to preserve

17  the Company's assets, including the potential fraudulent conveyance actions stemming from the 2004

18  cash out, but instead engaged in a series of risky and desperate acts in hopes of securing some value for

19  equity.

20      6.     In April of 2009, against the sound advice of their financial advisor, the directors

21  caused the Company to expend or encumber over $170 million in cash in exchange for a mere eight

22  month waiver of the Company's continuing covenant defaults.  In a blatant breach of their fiduciary

23  duties, the directors sought out and approved the waiver.  They did so not because it was in the best

24  interest of the Company and its creditors-indeed, the company was missing projections and losing

25  money every day-but in a desperate gamble to prolong the Company's life in hopes that they would get

26  lucky and secure some value for equity.  The Company received no value in exchange for the waiver.

27  The directors' ill-conceived "roll [of] the dice" for equity resulted in the unnecessary dissipation of the

28  Company's unencumbered assets and deepened the Company's insolvency.

COMPLAINT

1      7.      As the end drew near, in the three months immediately following the April 2009

2  waiver, the directors' devotion to securing funds for equity interests led to their most blatant and

3  egregious breach of fiduciary duty.  At this time, the directors unquestionably knew that the Company

4  was insolvent, that equity was hopelessly out of the money, and that a bankruptcy filing was inevitable.

5  In a final attempt to secure funds for equity interests, however, the directors refused to file bankruptcy

6  within the 90-day preference period following the April waiver.  Had they done so, the Company could

7  have secured the return of over $170 million for the benefit of all creditors.

8      8.      During the final month of the preference period, rather than exercising their fiduciary

9  duties to the Company, the directors were wholly engaged and focused on negotiations with the lenders

10  for a plan support agreement that provided for an anticipated recovery for equity interests in the tens of

11  millions of dollars.  This same agreement provided little to no recovery for general unsecured

12  creditors.  Although they had not yet secured a final agreement with the lenders, the directors allowed

13  the preference period to expire in the hope of currying favor from the lenders and finalizing a

14  restructuring plan that allocated recovery to equity.  Until the very day the Company filed its petition

15  for chapter 11 protection, the directors continued to approve various fees to the lenders, including

16  paying $3 million to JPMorgan immediately before filing.

17      9.      This action is brought by James Skorheim, as the Litigation Trustee on behalf of the

18  FCH Litigation Trust, created to pay claims of the unsecured creditors pursuant to the Company's

19  bankruptcy plan.  By this action, the Litigation Trustee seeks, on behalf of the FCH Litigation Trust, to

20  recover the damages to be proved at trial.

21                          **II.    PARTIES**

22  **A.    The Plaintiff**

23      10.     Plaintiff JAMES SKORHEIM ("Plaintiff") is the court-approved Litigation Trustee for

24  the FCH Litigation Trust, which was established in connection with the Joint Plan of Reorganization

25  under Chapter 11, Title 11, United States Code of Freedom Communications Holdings, Inc., *et al.* (the

26  "Plan") confirmed on March 9, 2010, by the United States Bankruptcy Court for the District of

27  Delaware (the "Bankruptcy Court") in the chapter 11 cases and proceedings (the "Bankruptcy

28  Proceedings") of Freedom Communications Holdings, Inc. ("Freedom Holdings") and Freedom

1    Communications, Inc. ("Freedom Communications," together with Freedom Holdings, the

2    "Company")[1] and their affiliated debtors and debtors in possession (collectively, the "Debtors").

3    Freedom Communications was an information and entertainment company headquartered in Irvine,

4    California.  Freedom Holdings owned 100% of Freedom Communications and had no significant

5    separate operations.  At all relevant times herein, Freedom Holdings and Freedom Communications

6    had identical Directors.

7           11.    The effective date of the Plan occurred on April 30, 2010.  On that date, the Debtors

8    transferred all of their right, title, and interest in the claims and causes of action asserted herein to the

9    FCH Litigation Trust.  The FCH Litigation Trust was created to investigate and prosecute potential

10   causes of action for the benefit of the Company's general unsecured creditors, who have suffered

11   damages as a result of the Company's directors' dereliction of their fiduciary duties.  These unsecured

12   creditors include, among others, the Gonzalez Plaintiffs (as further described below), parties to

13   rejected contracts, pension plan and non-qualified special retirement plan beneficiaries, and other

14   disfavored creditors.

15          12.    The Gonzalez Plaintiffs, who constitute the majority of the unsecured creditors, are

16   persons presently and formerly engaged as newspaper home delivery carriers by the Company who

17   were wrongly classified as "independent contractors," and therefore denied certain rights mandated

18   under California law.  The Gonzalez Plaintiffs commenced a class action against the Company on July

19   7, 2003, seeking damages for, among other things, failure to pay minimum wage and overtime wages,

20   failure to provide meal periods or compensation in lieu thereof, failure to provide rest periods or

21   compensation in lieu thereof, failure to reimburse reasonable business expenses, unlawful deductions

22   from wages, failure to provide itemized wage statements, failure to keep adequate payroll records,

23   waiting time penalties and unfair business practices.

24          13.    On January 30, 2009, the Gonzalez Plaintiffs and the Company entered into that certain

25   Stipulation and Agreement of Settlement by which the Company agreed, among other things, to

26

27   [1]    Freedom Holdings and Freedom Communications are Delaware Corporations with their
28   principal place of business and headquarters for operations in the City of Irvine, County of Orange,
     State of California.

1    deposit approximately $28 million into an escrow to pay settlements relating to the class action

2    proceeding (the "Gonzalez Settlement Funds"). As part of their overall scheme to favor out of the

3    money equity over the Company's legitimate creditors, however, the then-serving Directors planned to

4    and actually did prevent the escrowed funds from ever being distributed to the Gonzalez Plaintiffs.

5          14.    Pursuant to the Plan, Mr. Skorheim was appointed as the Litigation Trustee to exercise

6    and perform, on behalf of the FCH Litigation Trust, the rights, powers, and duties held by the Debtors'

7    estates with respect to the claims and causes of action asserted herein. Mr. Skorheim, in his capacity

8    as the Litigation Trustee, has sole authority and discretion to act on behalf of the FCH Litigation Trust

9    with respect to the claims asserted herein. Specifically, the Plan provides that the Litigation Trustee

10   has "the power, with sole authority and discretion . . . to evaluate and determine strategy . . . and to

11   prosecute, compromise, transfer, release, abandon and/or settle" these causes of action as he

12   determines to be in the best interests of the FCH Litigation Trust. The Plan further provides that, "[i]n

13   connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to

14   perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the

15   Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law."

16        15.    Mr. Skorheim, as the Litigation Trustee of the FCH Litigation Trust, is the real party in

17   interest herein and was at all times relevant hereto, and currently is a resident and citizen of Orange

18   County California.

19   **B.**    **The Defendants**

20        16.    The Defendants all held positions as directors of the Company (in such capacities, the

21   "Directors," and each individually a "Director") at all times relevant to the Complaint. Pursuant to the

22   Company's bylaws, the board of the Company (the "Board") had 13 seats: four reserved for the Family

23   Directors, four reserved for the Investor Directors, four reserved for the Independent Directors and one

24   reserved for a Management Director (each as defined below).

25        17.    Although the Board was intended to have thirteen seats, on September 1, 2009 (the

26   "Petition Date"), the date at which the Debtors filed voluntary petitions for relief under chapter 11 of

27   title 11 of the United States Code (the "Bankruptcy Code"), there were only ten active Directors: four

28   Family Directors, two Investor Directors, one Management Director, and three Independent Directors.

COMPLAINT

1    At all times relevant hereto, the Management Director was the Company's acting Chief Executive

2    Officer (the "CEO").

3         i.    **The Family Director Defendants**

4         18.    R.C. Hoiles founded the Company in 1935 with his purchase of the *Orange County*

5    *Register*. From its inception until May 18, 2004, the Company was wholly owned and operated by

6    R.C. Hoiles and his descendants (the "Hoiles Family"). On May 18, 2004, certain members of the

7    Hoiles Family cashed out their shares in the Company (the "Cashed Out Family Members") pursuant to

8    a recapitalization transaction (the "2004 Cash Out"). The remaining Hoiles Family shareholders (the

9    "Controlling Family Members") retained control of the Company at all relevant times hereto, and

10   collectively held approximately 52% ownership interest in the Company at the commencement of the

11   Bankruptcy Proceedings.

12        19.    Pursuant to the Company's bylaws, the Controlling Family Members were entitled to

13   appoint four Directors to the Board. Between May 18, 2004 and the Petition Date, the Controlling

14   Family Members appointed the following members of the Hoiles Family to serve as Directors:

15        20.    Defendant THOMAS W. BASSETT ("Bassett") was a Director and the Chairman of the

16   Board from 2004 through the Petition Date. On the Petition Date, Bassett and his immediate family

17   members were beneficiaries of various trusts owning approximately 749,137 shares of Series A stock

18   and 2060 shares of Senior Preferred stock in the Company (the "Bassett Interests"). Since the 2004

19   Cash Out, the Directors caused the Company to pay approximately $6,180,379 in dividends on account

20   of the Bassett Interests. On information and belief, Bassett was, at all times relevant hereto, and

21   currently is a resident of Missouri and California.

22        21.    Defendant RAYMOND C.H. BRYAN ("Bryan") was a Director from 2004 through the

23   Petition Date. On the Petition Date, Bryan and his immediate family members owned approximately

24   20,016 shares of Series A stock and 55 shares of Senior Preferred stock in the Company (the "Bryan

25   Interests"). Since the 2004 Cash Out, the Directors caused the Company to pay approximately

26   $165,132 in dividends on account of the Bryan Interests. On information and belief, Bryan was, at all

27   times relevant hereto, and currently is a resident of New York and California.

28

22.     Defendant ROBIN J. HARDIE ("Hardie") was a Director from 2004 through the Petition Date.  On the Petition Date, Hardie and her immediate family members collectively owned, either directly or as beneficiaries of various trusts, approximately 756,016 shares of Series A stock and 2,079 shares of Senior Preferred stock of the Company (the "Hardie Interests").   Since the 2004 Cash Out, the Directors caused the Company to pay approximately $6,237,129 in dividends on account of the Hardie Interests.  On information and belief, Hardie was, at all relevant times hereto, and currently is a resident of Texas.

23.     Defendant DAVID D. THRESHIE ("Threshie") was a Director from 2004 through 2007.  On the Petition Date, Threshie and his immediate family members collectively owned, either directly or as beneficiaries of various trusts or other corporate entities, approximately 595,493 shares of Series A stock and 1,637 shares of Senior Preferred stock in the Company (the "Threshie Interests").  Since the 2004 Cash Out, the Directors caused the Company to pay approximately $4,912,824 in dividends on account of the Threshie Interests.  On information and belief, Threshie was, at all relevant times hereto, and currently is a resident of Texas.

24.     Defendant GREGORY J. WALLACE ("Wallace," collectively with Bassett, Bryan, Hardie and Threshie, the "Family Directors," and each a "Family Director") was a Director from 2008 through the Petition Date.  On the Petition Date, Wallace and his immediate family members owned, either directly or as beneficiaries of various trusts, approximately 829,183 shares of Series A stock and 2,280 shares of Senior Preferred stock in the Company (the "Wallace Interests").  Since the 2004 Cash Out, the Directors caused the Company to pay approximately $6,840,761 in dividends on account of the Wallace Interests.  On information and belief, Wallace was, at all relevant times hereto, and currently is a resident of California.

ii.     **The Investor Director Defendants**

25.     Pursuant to the 2004 Cash Out, The Blackstone Group ("Blackstone") and Providence Equity Partners, Inc. ("Providence," and together with Blackstone, "B/P") purchased a minority interest in the Company.  At the commencement of the Bankruptcy Proceedings, B/P held a 48% ownership interest in the Company.

1     26.     Pursuant to the Company's bylaws, B/P were entitled to appoint four Investor Directors

2    to the Board.  Between May 18, 2004 and the Petition Date, B/P appointed the following Investor

3    Directors:

4     27.     Defendant DAVID M. TOLLEY ("Tolley") was a Director from 2004 through the

5    Petition Date.  Tolley was appointed as a Director by Blackstone.  On information and belief, Tolley

6    was, at all relevant times hereto, and currently is a resident of New York.

7     28.     Defendant MARK T. GALLOGLY ("Gallogly") was a Director in 2004 and 2005.

8    Gallogly was appointed as a Director by Blackstone.  On information and belief, Gallogly was, at all

9    relevant times hereto, and currently is a resident of New York.

10     29.     Defendant JILL A. GREENTHAL ("Greenthal") was a Director from 2006 through the

11    Petition Date.   Greenthal was appointed as a Director by Blackstone.  On information and belief,

12    Greenthal was, at all relevant times hereto, and currently is a resident of Massachusetts and California.

13     30.     Defendant MICHAEL J. DOMINGUEZ ("Dominguez") was a Director from 2004

14    through 2007.  Dominguez was appointed as a Director by Providence.   On information and belief,

15    Dominguez was, at all relevant times hereto, and currently is a resident of Rhode Island and California.

16     31.     Defendant MARK J. MASIELLO ("Masiello," collectively with Tolley, Gallogly,

17    Greenthal and Dominguez, the "Investor Directors," and each an "Investor Director") was a Director

18    from 2004 through 2007.  Masiello was appointed as a Director by Providence.  On information and

19    belief, Masiello was, at all relevant times hereto, and currently is a resident of Rhode Island.

20     32.     On the Petition Date, B/P held 1,317,406 shares of Class B stock, 1,729,234 shares of

21    Class C stock, and 7,896 shares of Junior Preferred stock of the Company.  Since May of 2004, the

22    Directors caused the Company to pay B/P, on information and belief, well over $20 million in

23    dividends and $3.375 million in monitoring fees.

24    **iii.**    **The Independent Director Defendants**

25     33.     Pursuant to the Company's bylaws, four seats on the Board were reserved for

26    independent Directors.  The independent Directors were intended to be free of any conflicts of interest

27    with respect to the Company.  Between May 18, 2004 and the Petition Date, the following independent

28    Directors were appointed to the Board:

34.     Defendant SCOTT N. FLANDERS ("Flanders") was a Director of the Company from 2004 through June 30, 2009.  From 2004 through January 1, 2006, Flanders was an Independent Director.  On January 1, 2006, Flanders ceased to be an Independent Director and was appointed CEO of the Company.  Beginning on January 1, 2006, and through his departure on June 30, 2009, Flanders was a Management Director.  On information and belief, Flanders was, at all relevant times hereto, and currently is a resident of California.

35.     Defendant BURL OSBORNE ("Osborne") was a Director of the Company from 2004 through the Petition Date.  From 2004 until around June 30, 2009, Osborne was an Independent Director.  Around July 1, 2009, Osborne ceased to be an Independent Director and was appointed CEO of the Company.  From around July 1, 2009 until the Petition Date, Osborne was a Management Director.  Osborne is named a defendant to this action in his capacity both as a Director and as CEO.  On information and belief, Osborne was, at all relevant times hereto, and currently is a resident of Texas and California.

36.     Defendant WILLIAM F. BAKER ("Baker") was a Director of the Company from 2004 through the Petition Date.  On information and belief, Baker was, at all relevant times hereto, and currently is a resident of Connecticut and California.

37.     Defendant CHRIS PHILIBBOSIAN ("Philibbosian") was a Director of the Company from 2008 through the Petition Date.  On information and belief, Philibbosian was, at all relevant times hereto, and currently is a resident of Nevada.

38.     Defendant JAMES J. SPANFELLER ("Spanfeller," collectively with Baker, Flanders (for the period set forth above), Osborne (for the period set forth above) and Philibbosian, the "Independent Directors," and each an "Independent Director") was a Director of the Company from 2006 through the Petition Date.  On information and belief, Spanfeller was, at all relevant times hereto, and currently is a resident of New York.

C.     The Doe Defendants

39.     Defendants DOES 1 through 25, inclusive, are sued herein under fictitious names.  Their true names and capacities are unknown to Plaintiff.  When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein.

COMPLAINT

1  Each of the fictitiously named Defendants is indebted to Plaintiff on the obligation hereinafter

2  described.

3         40.    The Directors likely committed other wrongful acts or omissions of which Plaintiff is

4  presently unaware.  Plaintiff will therefore seek leave of the Court to amend this Complaint when

5  Plaintiff discovers these other acts and/or omissions of the Defendants.

6                    **III.    JURISDICTION AND VENUE**

7         41.    Jurisdiction and venue are proper in this Court.  The amount in controversy exceeds the

8  minimum jurisdictional amount and the action presents state law claims against the former Directors of

9  two corporations that had their principal place of business and headquarters for operations in Irvine,

10  California.  Thus, the relationships, agreements and conduct upon which these causes of action are

11  based were entered into and performed or to be performed in Orange County.  All of the named

12  Defendants, some of whom are domiciled in Orange County, and all of whom carried out the

13  transactions complained of in Orange County, clearly had minimum contacts and are therefore subject

14  to this Court's jurisdiction and venue.  In addition, at all times relevant hereto, the Plaintiff, who is the

15  real party in interest, was and is a resident and citizen of Orange County California.

16                    **IV.    FACTUAL ALLEGATIONS**

17  **A.    The Company**

18         42.    Before its financial collapse at the hands of the Defendants, the Company was a

19  well-respected and seemingly permanent fixture in the information and entertainment industry.  Prior

20  to the commencement of the Bankruptcy Proceedings, the Company's portfolio included 30 daily

21  newspapers (including *The Orange County Register*), numerous weekly newspapers, magazines and

22  specialty publications, and eight broadcast television stations, all with complementary news,

23  information and entertainment websites.

24         43.    As of May 18, 2004, the Company was 100% owned and operated by members of the

25  Hoiles Family and it had only $323 million in funded debt.

26  **B.    The 2004 Over-Leveraging of the Company**

27         44.    Notwithstanding years of strong operating performance and growth, in 2004, the

28  Controlling Family Members orchestrated a highly leveraged buyout of the Cashed Out Family

COMPLAINT

Members' interests, which proved to be a devastating and eventually fatal blow to the Company's financial well-being. At this time, an intra-family dispute arose among the Hoiles Family members regarding the future and direction of the Company. Certain members of the Hoiles Family sought to liquidate their ownership interests and capitalize on the financial strength and goodwill of the Company. Other members, however, opposed an outright sale, refusing to relinquish control over the Company to a third party. Unable to reach a consensus, the Hoiles Family settled the dispute by implementing an ill-conceived hybrid transaction that allowed the Controlling Family Members to retain management control of the Company while "buying out" the Cashed Out Family Members (*i.e.*, the 2004 Cash Out) for approximately $960 million.

45.     As part of the 2004 Cash Out, Blackstone and Providence purchased approximately 40% (subject to future mandatory increases in the form of stock dividends of 1.5% per quarter)[2] of the common stock of Freedom Holdings for $467 million. The Company also borrowed approximately $900 million pursuant to that certain Credit Agreement (the "Credit Agreement")[3] dated May 18, 2004 by and among Freedom Holdings and Freedom Communications as borrower, the lenders party from time to time thereto (the "Lenders") and JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent for the Lenders. In connection with the Credit Agreement, the Company granted JPMorgan, in its capacity as collateral agent, security interests and liens in substantially all of its assets. The Credit Agreement, however, did not contain a comprehensive cash management provision and thus allowed the Company to hold cash outside of JPMorgan's control.

46.     Of the approximately $1.4 billion in new funds (the "Cash Out Funds") generated by the 2004 Cash Out, only $20 million remained available for the Company at the conclusion of the transaction. Over $300 million of the Cash Out Funds were used to repay the Company's existing debt and another $20 million were used to pay the prepayment penalty on such debt. Of the remaining

---

[2]     As a result of these dividends, B/P owned approximately 48% of the Company on the Petition Date.

[3]     The Credit Agreement was amended by (a) that certain Amendment Agreement, dated May 19, 2005; (b) that certain Amendment No. 2 and Agreement, dated December 12, 2005; (c) that certain Amendment No. 3 and Agreement, dated April 30, 2007; and (d) that certain Amendment No. 4, Waiver and Agreement, dated April 29, 2009.

COMPLAINT

1   funds, more than $1 billion went directly to the Cashed Out Family Members, B/P, JPMorgan and

2   other financial advisors.  Specifically:

3       •     $960 million went to those members of the Hoiles Family liquidating their

4             ownership interests for repurchase of their stock in the Company;

5       •     $20 million went to B/P for transaction fees and expenses;

6       •     $24 million went to other financing costs and fees.

7       47.   At least $23 million of such fees and costs were paid to JPMorgan.  In addition to the at

8   least $64 million of fees and expenses that rendered no benefit to the Company, the 2004 Cash Out

9   subjected the Company to burdensome financial covenants and liens in substantially all of its assets.

10      48.   In short, the repurchase of the Cashed Out Family Members' shares and the payment of

11  the tens of millions of dollars in fees and costs associated with the 2004 Cash Out were not funded out

12  of the Controlling Family Members' own pockets or by an infusion of capital from third parties.

13  Rather, the majority of the 2004 Cash Out was funded by saddling the Company with hundreds of

14  millions of dollars of secured debt, for which the Company received little to no value in return.

15      49.   The 2004 Cash Out devastated the Company's balance sheet.  Prior to the 2004 Cash

16  Out, the Company is estimated to have had less than $350 million in funded debt.  After the 2004 Cash

17  Out, funded debt increased to approximately $900 million.  Prior to the 2004 Cash Out, the Company's

18  debt to EBITDA ratio is estimated to have been less than 2x.  After the 2004 Cash Out, that ratio

19  nearly tripled to approximately 5x, and further increased thereafter.  As of March 1, 2004, prior to the

20  2004 Cash Out, shareholder equity is estimated to have been in excess of $350 million.  After the 2004

21  Cash Out, shareholder equity fell almost half a billion dollars, dropping to an estimated deficiency of

22  $130 million as of December 31, 2004.  Indeed, the Company never fully recovered, and shareholder

23  equity remained negative from the time of the 2004 Cash Out until it filed bankruptcy on the Petition

24  Date.

25      50.   Simply put, the 2004 Cash Out severely impaired the Company's balance sheet by

26  draining any and all surplus, eliminating shareholder equity, increasing total funded debt by almost

27  $600 million, and resulted in the Company's total liabilities far exceeding the total value of its assets.

28  The 2004 Cash Out rendered the Company insolvent with unreasonably small capital to adapt to and

1    weather a changing marketplace or withstand any significant downturn in business or fluctuation in the

2    industry.

3         51.    After the 2004 Cash Out, the Company was insolvent and the Company's equity

4    holders-the Controlling Family Members and B/P-were out of the money.  Accordingly, following the

5    2004 Cash Out, the Directors were no longer agents of the equity holders, and had fiduciary duties to

6    manage the Company for the benefit of creditors; the consequence of every act or omission of the

7    Directors relating to the operation of the Company would inure to the benefit or detriment of the

8    creditors, rather than the equity holders, until the Company regained solvency.

9         52.    The Company, however, never regained solvency.

10        53.    Indeed, the Company's financial plight was readily apparent to the Lenders shortly after

11   the 2004 Cash Out.  On information and belief, JPMorgan and the Lenders understood that the

12   Company was overleveraged within a year of the closing of the 2004 Cash Out and responded by

13   immediately reducing their exposure.  In May 2005, JPMorgan, the Lenders and the Company

14   executed an amendment to the Credit Agreement whereby the Lenders' exposure was reduced by $100

15   million.  A second amendment was executed in December of 2005, further reducing the Lenders'

16   exposure by $50 million.  The Directors caused the Company to pay JPMorgan fees in connection with

17   each of these amendments.

18        54.    As explained above, after the 2004 Cash Out, the Directors had a fiduciary duty to act

19   in the best interests of the Company and its creditors.  The Directors' actions between the 2004 Cash

20   Out and the Petition Date, however, were consistently in contravention of this duty.  During this

21   period, the Family Directors and the Investor Directors continued to act in blind devotion to the equity

22   holders' interests and engaged in self-dealing by both siphoning cash out of the Company, both in the

23   form of dividend payments to shareholders and monitoring fees to B/P, and improperly using the

24   Company's assets as a bargaining chip with the Lenders in an attempt to create value for insiders and

25   out of the money equity positions at the expense of the unsecured creditors.  The Independent

26   Directors did nothing to prevent such self-interested acts, but rather followed suit and maintained their

27   loyalties to the equity holders to the detriment of the Company's creditors.  Abusing their position of

28   control of the Company, the Directors relentlessly championed the interests of shareholders and

1  engaged in a series of acts that recklessly gambled precious Company assets for a chance at salvaging

2  some minimal equity for the shareholders.

3  **C.     The Directors Repeatedly Approve Dividend Payments to Shareholders Despite**

4         **the Company's Insolvency**

5         **i.     The 2004 Dividend Payments**

6         55.     Foreshadowing even greater breaches of fiduciary duty to come, despite the fact that the

7  Company had just spent over a billion dollars completing the 2004 Cash Out and was saddled with an

8  unmanageable debt load, the Directors approved quarterly dividend payments to shareholders.  In utter

9  disregard for the financial viability of the Company as a going concern, on information and belief, the

10 Directors never considered suspending dividend payments while the Company was insolvent.  Rather,

11 the Directors continued paying exactly the same dividend the Company had paid before the 2004 Cash

12 Out when it had significant shareholder equity and hundreds of millions of dollars less in debt.  In each

13 of the final two quarters of 2004, the Directors declared and paid out a dividend to shareholders of 55

14 cents per share, which totaled more than $6 million (the "2004 Dividend Payments").  The 2004

15 Dividend Payments were authorized by the Directors in the third and fourth quarters of 2004 and paid

16 at a time when the Company did not have adequate surplus or net profits to lawfully declare and pay

17 such dividends.

18        56.     Given the Company's fragile financial state following the 2004 Cash Out, the Directors'

19 approval of the 2004 Dividend Payments could not have been an exercise of reasonable care or a

20 rational and fully-informed decision.  Rather, the 2004 Dividend Payments reflect the Directors'

21 reckless disregard of their fiduciary duties and what was best for the Company and its beneficial

22 owners, the creditors.

23        57.     On information and belief, Family Directors Basset, Bryan, Hardie, and Threshie were

24 on the Board in 2004.  Of the 2004 Dividend Payments, the Directors caused $824,051 to be paid on

25 account of the Bassett Interests; $22,018 to be paid on account of the Bryan Interests; $831,617 to be

26 paid on account of the Hardie Interests; and $655,043 to be paid on account of the Threshie Interests.

27 Investor Directors Dominguez, Gallogly, Masiello, and Tolley were on the Board in 2004.  On

28

COMPLAINT

1  information and belief, the Directors caused approximately $3 million in dividend payments and $375

2  thousand in monitoring fees to be paid to B/P in 2004.

3       ii.    **The 2005 and 2006 Dividend Payments**

4      58.    The Company remained insolvent throughout 2005 and 2006.  The Company's balance

5  sheet showed a negative shareholder equity in both years and the Company lacked sufficient capital to

6  adapt to fluctuations in the marketplace and service its debt through maturity.  Given its overleveraged

7  state, the Company could not afford to dissipate more cash to out-of-the money shareholders.

8  Nevertheless, the Directors, as a matter of course, recklessly and/or negligently declared and paid out a

9  dividend to the Company's shareholders in the amount of 55 cents per share per quarter, which totaled

10  more than $12 million in 2005 (the "2005 Dividend Payments") and more than $12 million in 2006

11  (the "2006 Dividend Payments").

12      59.    By approving the 2005 and 2006 Dividend Payments, the Directors acted in direct

13  contravention of the best interests of the Company and its creditors, who were the beneficial owners of

14  the Company at that time.  Accordingly, the 2005 and 2006 Dividend Payments were an improper

15  diversion of creditors' cash to shareholders.  The 2005 and 2006 Dividend Payments were authorized

16  by the Directors and paid at a time when the Company did not have adequate surplus or net profits to

17  lawfully declare and pay such dividends.

18      60.    Family Directors Basset, Bryan, Hardie, and Threshie were on the Board in 2005.  Of

19  the 2005 Dividend Payments, the directors caused $1,648,101 to be paid on account of the Bassett

20  Interests; $44,035 to be paid on account of the Bryan Interests; $1,663,235 to be paid on account of the

21  Hardie Interests; and $1,310,087 to be paid on account of the Threshie Interests.  Investor Directors

22  Dominguez, Gallogly, Masiello, and Tolley were on the Board in 2005.  On information and belief, the

23  Directors caused in excess of $6 million in dividend payments and $750 thousand in monitoring fees

24  to be paid to B/P in 2005.

25      61.    Family Directors Basset, Bryan, Hardie, and Threshie were on the Board in 2006.  Of

26  the 2006 Dividend Payments, the directors caused $1,648,101 to be paid on account of the Bassett

27  Interests; $44,035 to be paid on account of the Bryan Interests; $1,663,235 to be paid on account of the

28  Hardie Interests; and $1,310,087 to be paid on account of the Threshie Interests.  Investor Directors

COMPLAINT

1 │ Dominguez, Greenthal, Masiello, and Tolley were on the Board in 2006.  On information and belief,

2 │ the Directors caused in excess of $6 million in dividend payments and $750 thousand in monitoring

3 │ fees to be paid to B/P in 2006.

4 │       **iii.**    **The 2007 Dividend Payments**

5 │       62.    In 2007, the Company's financial condition worsened.  Unable to meet the challenges of

6 │ the global recession  while servicing its massive debt load, the Company's revenues plummeted and it

7 │ posted a net loss of approximately $706,000.  Due to its insolvency and astronomical debt service

8 │ costs, the Company simply could not weather the economic downturn.  The Directors, however, were

9 │ undeterred by the Company's ailing finances.  In 2007, the Directors again negligently declared and

10 │ paid out a dividend to the Company's shareholders in the amount of 55 cents per share per quarter,

11 │ which totaled more than $13 million (the "2007 Dividend Payments").  Notwithstanding nearly a

12 │ million dollars in losses and the ongoing recession, the Directors approved the same amount of

13 │ dividends they had approved in previous years.

14 │       63.    A board of directors acting in compliance with its fiduciary duties would not have

15 │ authorized the 2007 Dividend Payments.  Had the Directors been fulfilling their fiduciary duties to the

16 │ Company and its creditors as the beneficial owners, the Directors would have suspended dividend

17 │ payments immediately following the 2004 Cash Out.  The Directors' approval of the 2007 Dividend

18 │ Payments despite the Company's struggles operating in a global economic meltdown, therefore, was

19 │ motivated solely by the interest of equity, and not the interest of the Company or its creditors.  Indeed,

20 │ on information and belief, the Directors failed to even consider reducing the amount of the dividend to

21 │ reflect the Company's revenue losses and ailing finances.  The Directors' declaration of the 2007

22 │ Dividend Payments demonstrates that they had abandoned all business judgment and placed equity's

23 │ (and for the majority of Directors, their own) interests above all else.  The 2007 Dividend Payments

24 │ were authorized by the Directors in 2007 and paid at a time when the Company did not have adequate

25 │ surplus or net profits to lawfully declare and pay such dividends.

26 │       64.    Family Directors Basset, Bryan, Hardie, and Threshie were on the Board in 2007.  Of

27 │ the 2007 Dividend Payments, the Directors caused $1,648,101 to be paid on account of the Bassett

28 │ Interests; $44,035 to be paid on account of the Bryan Interests; $1,663,235 to be paid on account of the

1   Hardie Interests; and $1,310,087 to be paid on account of the Threshie Interests. Investor Directors

2   Dominguez, Greenthal, Masiello, and Tolley were on the Board in 2007. On information and belief,

3   the Directors caused in excess of $6 million in dividend payments and $750 thousand in monitoring

4   fees to be paid to B/P in 2007.

5           iv.     **The 2008 Dividend Payments**

6           65.     In 2008, the Company spiraled further into insolvency, recording losses in excess of

7   $160 million. Negative shareholder equity is estimated to have ballooned to nearly $270 million. The

8   Directors, however, remained unwavering in their loyalty to the Company's shareholders (and thereby,

9   in the case of the majority of the Directors, themselves) and disregarded their fiduciary duties to the

10  Company. Indeed, in the first quarter of 2008, the Directors declared and paid out dividends totaling

11  more than $3 million (the "2008 Dividend Payments"). The 2008 Dividend Payments were authorized

12  by the Directors in 2008 and paid at a time when the Company did not have adequate surplus or net

13  profits to lawfully declare and pay such dividends.

14          66.     Family Directors Basset, Bryan, Hardie, and Wallace were on the Board in 2008. Of

15  the 2008 Dividend Payments, the Directors caused $412,025 to be paid on account of the Bassett

16  Interests; $11,009 to be paid on account of the Bryan Interests; $415,809 to be paid on account of the

17  Hardie Interests; and $456,051 to be paid on account of the Wallace Interests. Investor Directors

18  Greenthal and Tolley were on the Board in 2008. On information and belief, the Directors caused $1.5

19  million in dividend payments and $750 thousand in monitoring fees in to be paid to B/P in 2008.

20  **D.      The Company Struggled to Avoid a Covenant Default on June 30, 2008**

21          67.     Suffocated by the Company's massive debt obligations and an increasingly adverse

22  business environment, the Company's financial condition continued to deteriorate. By early 2008, the

23  Company faced a significant risk of defaulting on its covenants under the Credit Agreement. The

24  Company's inability to service its debts was readily apparent, as was the need to seek chapter 11

25  protection in order to preserve the value of the Company for the benefit of its creditors. Had the

26  Directors filed a chapter 11 bankruptcy at this time, they would have preserved the right for the estate

27  created thereby to contend that the 2004 Cash Out constituted a fraudulent conveyance and recovered

28  and/or avoided over $1 billion in funds and/or obligations. The Directors, however, never considered

1   filing a chapter 11 bankruptcy. Rather, they engaged in a series of high-risk maneuvers in an attempt

2   to prolong the life of the Company in hopes of recovering minimal value for shareholders.

3         68.   In the first half of 2008 the Company "really had to work hard" to implement strategies

4   to avoid breaching the covenants contained in the Credit Agreement. In order to meet these covenants,

5   the Company finally ceased making dividend payments in the second quarter of 2008. Although the

6   company managed to "barely squeak[] by" and avoid a covenant default on June 30, 2008, the

7   Directors recognized that a covenant default on September 30, 2008 was imminent.

8   **E.**   **The Company Goes into Covenant Default on September 30, 2008**

9         69.   In August, 2008, in anticipation of the September 30, 2008 covenant default, the

10  Directors decided to completely draw down the Company's revolver in the amount of $240 million and

11  place these funds in an unencumbered bank account outside of the Lenders' control (the

12  "Unencumbered Cash"). The Directors intended to use the Unencumbered Cash as a bargaining tool

13  against the Lenders to secure value for equity in the event of the Company's bankruptcy. At about the

14  same time, the Company engaged a prominent bankruptcy firm to serve as restructuring counsel.

15        70.   In September 2008, the Company defaulted on its covenants under the Credit

16  Agreement. The Company officially acknowledged the default in mid-November. The Company,

17  however, did not seek bankruptcy protection. Recognizing that the Company's liabilities far exceeded

18  its assets and filing for bankruptcy protection would eliminate any recovery for equity, the Directors

19  began to strategize alternative ways by which out of the money shareholders could recover some value.

20  At about the same time, despite acknowledging its default under the Credit Agreement, the Directors

21  caused the Company to continue paying "monitoring" fees to B/P.

22  **F.**   **Despite the Company's Insolvency, the Directors Begin to Plot Ways for Equity**

23         **to Recover Funds**

24        71.   Around this time, the Directors determined that they could best protect the interests of

25  equity holders by either (1) using the Unencumbered Cash to negotiate a limited consensual

26  restructuring of the Company for the benefit of shareholders; or (2) purchasing a temporary waiver

27  from the Lenders and gambling on the off chance that the Company's operating performance would

28  improve or they could otherwise realize a higher valuation of the Company within the waiver period.

72.     The first option, advocated by some of the Directors, contemplated using the Unencumbered Cash as leverage to negotiate an out of court restructuring plan that would circumvent the Bankruptcy Code's absolute priority rule and provide some recovery for equity holders. The Lenders did not hold liens in the Unencumbered Cash and would not have had priority rights therein in the event of an in-court restructuring. Indeed, had they filed for bankruptcy protection, the funds in the Unencumbered Cash would have been available to satisfy the claims of the Company's general unsecured creditors. Given that the Lenders' total claims against the Company far exceeded the value of the Company's assets securing such claims, priority rights to the cash in the Unencumbered Cash was a seemingly powerful bargaining chip. Under this first option, the Directors would surrender the Unencumbered Cash (which rightfully should have been used in a formal chapter 11 restructuring and distributed in accordance with the absolute priority rule) to the Lenders in return for a consensual restructuring plan that offered some minimal recovery for shareholders.

73.     The second option, spearheaded by other Directors, proposed gambling with the Unencumbered Cash-the Company would expend precious corporate assets to purchase a short-term waiver from the Lenders in the "hope" that the Company's financial condition would stabilize within the waiver period. The Directors hoped that if the Company's bankruptcy filing could be delayed until the beginning of 2010, the Company would, by then, have "come to a place where [it] could have more in the way of equity value than would appear evident given the valuations and [its then-] current operations." The Directors wanted to avoid an immediate in-court restructuring at all costs because the valuations for media companies had gone "right down the toilet" (i.e., fair market value of the Company was substantially less than the Company's then-outstanding obligations of approximately $1 billion), and the Company's shareholders stood to recover nothing.

74.     The Directors, ever motivated by the sole objective of extracting value for equity regardless of the Company's financial condition, engaged the Lenders in discussions regarding a waiver from November 2008 through April 2009. The main deal points in these discussions were the length of the waiver term and the proportion of the Unencumbered Cash the Company would surrender to the Lenders' control. As of January 1, 2009, the Company was holding substantial cash-over $190

1  million-most of which was unencumbered.  Indeed, approximately $170 million was not held in

2  accounts subject to control agreements and therefore not subject to JPMorgan's liens.

3  **G.    In March of 2009 the Company's Financial Advisors Warn against Pursuing a Waiver**

4       75.    In March 2009, the Company engaged Houlihan Lokey ("Houlihan") as its financial

5  advisor.  Following a review of the Company's financial condition and an analysis of its options,

6  Houlihan strongly recommended that the Directors pursue a comprehensive restructuring rather than a

7  waiver.  In support of this recommendation, Houlihan urged the Directors to consider whether the

8  proposed waiver realistically provided enough time for the industry to rebound and what the magnitude

9  of any such rebound was likely to be.  Houlihan further suggested that the Lenders could very well take

10  the position that equity was "out of the money" and accelerate the loans if their demands in the

11  ongoing waiver negotiations went unmet.

12       76.    In light of these considerations, Houlihan advised the Directors that the "*best course to*

13  *maximize value*" was to pursue a more comprehensive restructuring transaction, rather than a waiver

14  transaction, and that the "*most significant*" key to success of such a transaction would be the

15  Company's strong unencumbered cash position.  While the proposed waiver agreement would defer

16  dilution of existing equity, it would substantially deplete liquidity and contained new covenants that

17  could result in a near-term default, greatly restricting the Company's restructuring options and

18  materially reducing the Company's leverage against the Lenders by encumbering its cash.

19       77.    Houlihan's plan was both advisable and highly feasible.  Absent a waiver or bankruptcy,

20  Houlihan predicted that the Company's cash balance would stand at $104,937,000 at the end of 2009.

21  Furthermore, if the Company commenced chapter 11 proceedings as Houlihan advised, the Company's

22  year end cash position was projected to be $184,000,000 in 2009 and $167,100,000 in 2010.

23       78.    Ignoring Houlihan's unequivocal advice to forgo a waiver and utilize the Unencumbered

24  Cash to effect a comprehensive restructuring, the Directors continued on their quixotic quest for a

25  recovery to shareholders and encumbered nearly all of their Unencumbered Cash in exchange for a

26  waiver of less than three quarters (the "Waiver").  The Directors' decision was extremely high-risk and

27  ill-advised as the probability that the Company would meet the amended covenants in the Waiver

28  Agreement, much less that the company would become solvent by 2010 was *de minimus* at best.

COMPLAINT

**H.    In Hopes of Securing Some Value for Equity, the Directors Purchase a Waiver**

79.    In the Company's CFO's own estimation, a favorable outcome would result only if there was a general market recovery, a more favorable valuation environment for media companies, and luck was on the Company's side.  Based on the Company's circumstances leading up to the Waiver, however, it was readily apparent that the foregoing events would not occur, and this desperate attempt to secure value for equity would be unsuccessful.  In March 2009, shortly before the Directors went ahead with the Waiver, the Company was experiencing ever-falling revenues and was failing to meet any of the financial forecasts projected by its management.  As described by the Company's interim CFO in place at the time of the Waiver, despite management's best efforts, the Company's performance "just continued to get worse, not better, and as [management] pulled costs out, things just continued to go down."  At this time, the fair market value of the Company's assets was far less than its debts and equity was indisputably out of the money.

80.    Notwithstanding the foregoing, the Directors chose to bet Company's assets on the Waiver rather than admit that equity was out of the money and pursue a real fix.  In the baseless hopes of some extraordinary market turnaround, the Directors placed the Company's assets at extraordinary risk for the sole benefit of shareholders.  As the residual risk-bearers of the insolvent Company, this risk was borne entirely by the Company's creditors.

81.    On April 29, 2009, the Company, the Lenders and JPMorgan entered into that certain Amendment No. 4, Waiver and Amendment, to the Credit Agreement (the "Waiver Agreement").  Among other things, the Waiver Agreement waived the Company's past covenant defaults and revised its covenant obligations through the end of 2009.  Pursuant to the Waiver Agreement and in connection therewith, the Company:

- paid down $40 million on their revolving credit facility (the "Waiver Revolver Preference");
- paid down $52.5 million on Term Loan A (the "Waiver Term Loan Paydown Preference");
- agreed to an interest rate increase of 200 basis points;

1   • agreed to keep no less than 85% of their free cash (at the time approximately

2    $71 million) in the control of JPMorgan and subject to its liens (the "Waiver

3    Lien Preference")'

4   • paid a waiver fee of $13,331,250 (the "Waiver Fee Preference");

5   • paid to JPMorgan a "Work Fee" of $3 million (the "Waiver Work Fee");

6  82. Indeed, all things considered, the Waiver Agreement reduced the Company's

7 Unencumbered Cash by $179,831,250 (the "Waiver Consideration").[4]

8  83. The Waiver Agreement left the Company with substantially depleted liquidity and

9 assets, and subject to a higher interest rate on its primary debt obligations. As succinctly described in

10 the Company's First Day Affidavit, "[u]nder the April 29 Amendment, in exchange for fees, an interest

11 rate increase, accelerated amortization payments, revolver repayment and permanent reduction, and

12 entry into control agreements with respect to certain of the Debtors' accounts, the lenders agreed to

13 grant the Debtors a temporary waiver of the defaults through December 31, 2009, unless earlier

14 terminated."

15  84. In sum, the Company and its creditors, as the Company's beneficial owners, gained

16 nothing from the Waiver. The Directors had procured for equity eight more months of control and the

17 hope (albeit an unrealistic one) that a miraculous market turnaround might result in some minimal

18 recovery to equity.

19  85. Given the lack of value received by the Company under the Waiver Agreement, the

20 magnitude of the Waiver Consideration was extraordinary. Even the Directors internally

21 acknowledged that the fees paid in connection to the Waiver Agreement were exorbitant. Yet, the

22 Directors did nothing to contain such fees and costs as they were funded out of the creditors', and not

23 the equity holders', pockets. With this in mind, the Directors were willing to make any payments,

24 whatever the amount, necessary to close the Waiver.

25  86. Prior to the execution of the Waiver Agreement, the Directors engaged in a "general

26 discussion [with management] . . . about ultimately trading the amount of the fee that the banks wanted

27

28 [4] In their presentations to the Directors regarding the Waiver Consideration, Houlihan uses the amount of $162 million. Plaintiff is unaware of the basis for this discrepancy.

1   for things that were more important to the company in pursuing its [waiver] strategy." The Company's

2   management carried out this general directive (as authorized by the Directors), and granted JPMorgan

3   whatever "fee that the banks wanted" in exchange for the Waiver. Highlighting the utter lack of value

4   the Company received for the Work Fee, the Company's then-CFO has described such payment as

5   JPMorgan's "additional opportunity to get some more money out of the company."

6   I.     Forced to Accept that Formal Restructuring Is Inevitable, the Directors Pursue a Course

7          of Action Intended to Maximize Recovery for Equity

8          87.     Given that the Waiver Agreement provided only a brief eight-month waiver of the

9   Company's continuing defaults under the Credit Agreement, restructuring discussions continued

10   without pause. During these discussions, the Directors were specifically and repeatedly apprised that

11   the Waiver Consideration could be avoided in its entirety as a preferential transfer if the Company

12   commenced bankruptcy proceedings within 90 days of the execution of the Waiver Agreement (i.e. by

13   July 29, 2009) (the "Preference Period"). Specifically, Houlihan counseled the Directors that the

14   possible avoidance of the Waiver Consideration could be leveraged to obtain benefits for shareholders.

15          88.     Houlihan's pre-Waiver admonition to the Directors to focus on maximizing enterprise

16   value rather than an equity recovery had fallen on deaf ears. The Directors were uninterested in

17   anything other than chasing recovery for the Company's shareholders, as consistently reflected in their

18   internal communication. For example, on June 12, 2009, the Family Directors and certain other

19   members of the Hoiles Family considered whether, among other things, they would "want to go to BK

20   if the most the family can get is 45 million in 1/2013?" or if they should instead, "[r]oll the dice and

21   see what happens?" Threshie declared, "I'm for whatever scenario that gives our shares a chance to be

22   worth something. And this is for estate planning reasons."

23          89.     This improper pursuit of equity's interests at all costs was not only the stated goal of

24   those Directors holding shares, but also that of the supposedly independent Directors and officers

25   working at their behest. Flanders, formerly an Independent Director and at this time the CEO, on

26   information and belief, was absolutely focused on obtaining a recovery for equity. Even outside

27   consultants had to be properly indoctrinated to act in equity's interest before being hired. The

28   Company's interim CFO, in negotiating the terms of her consulting contract, offered to the Directors

1    that her success might be measured in terms of maximizing equity value.  Unsurprisingly, the interim

2    CFO and Flanders shared a unified strategic approach to gambling for a recovery to equity.

3        90.     Recognizing the Directors' myopic obsession with equity recovery, Houlihan refocused

4    its analysis on securing value for equity.  In a voluminous seventy-eight page presentation to the

5    Directors on June 12, 2009, Houlihan devoted substantial space justifying a recovery to equity

6    notwithstanding its acknowledgement that the base-case valuation of the Company of between $405.2

7    and $547.5 million was substantially less than the $770.6 million in secured debt (post-Waiver

8    Agreement).  In a supplemental presentation dated June 13, 2009, evaluating a "Chapter 11 Timing

9    Impact on Bankruptcy," Houlihan advised the Directors that the possibility of chapter 11 filing prior to

10    July 29, 2009 and the associated implications of the preference period, coupled with the impact on

11    Lenders' recoveries, was an important leverage point that could be used against the Lenders to

12    negotiate a restructuring that would give the Company more operating flexibility, including an

13    allocation of value to shareholders.  In relevant part, the presentation advised that:

> The Secured Lenders may be willing to provide additional consideration
> to existing shareholders in exchange for the Company taking actions that
> would maximize recoveries to the Secured Lenders . . . All else equal,
> the Secured Lenders will likely receive the highest recovery if the
> Company files for Chapter 11 after the expiration for the preference
> period and prior to the distribution of cash on account of the Gonzalez
> settlement.  A strategy that focuses on maximizing secured lender
> recoveries **in exchange for a reasonable recovery to existing equity**
> could help facilitate a quick and consensual restructuring. . . . In
> exchange for receiving a greater portion of their recovery in new debt,
> certain Secured Lenders may be willing to give up more consideration to
> Existing Equity in the form of additional reorganized equity or warrants.

(emphasis added).  The presentation opined that a filing between July 29, 2009 (the end of the

Preference Period) and the September 2009 release date of the "Gonzalez Settlement Funds" would

maximize the value to the Lenders, which would, in turn, potentially afford some recovery to equity.

**J.     The Directors Let the Preference Period Expire While Pursuing the Interests of the**

     **Company's Shareholders**

       91.     Following the Waiver Agreement and the approval of the Settlement Agreement, the

Directors were left with one last bargaining chip with which to gamble on behalf of equity

recovery-timing of the Company's chapter 11 filings.  Based on the projections provided to the

1  Directors, the best case scenario with respect to recovery for the Unsecured Creditors would occur if

2  the Company commenced its chapter 11 cases before the Preference Period expired.

3       92.    The Directors' fiduciary duties to the Company obligated them to commence chapter 11

4  proceedings before the Preference Period expired and maintain the value of the Company for the

5  benefit of all creditors.  The Directors, however, acted to the contrary.  Hoping to curry favor with the

6  Lenders, the Directors elected to implement the scenario that would be most beneficial to the Lenders

7  and thereby, they hoped, equity.

8       93.    On July 1, 2009, the Directors proposed chapter 11 restructuring terms to the Lenders

9  that provided for filing after the Preference Period had run and issuing 5% of the new common stock to

10  old equity, with 7 year warrants to purchase 20% of fully diluted new common stock, and another 12%

11  of equity to be reserved for management incentives.  Under this proposal, only trade unsecured debt

12  would be paid.  The Directors took no action for the benefit of the Unsecured Creditors, such as

13  preserving preference avoidance actions or seeking payment of unsecured claims other than trade

14  claims.

15       94.    On July 20, 2009, the Lenders issued a counter-proposal, which offered 1% of the new

16  common stock to old equity.  Again, only trade debt would be paid in full.  This counter-proposal, like

17  the Directors' original proposal, allocated no payments to the Unsecured Creditors.

18       95.    The Directors were encouraged by the Lenders' counter-proposal as it included some

19  recovery for equity.  Accordingly, although the Directors had yet to finalize a deal with the Lenders,

20  the Directors decided to adopt a course of action that would maximize recoveries to Lenders (to the

21  detriment of the Company as a whole) and attempt to secure from the Lenders as much value as

22  possible for the Company's equity holders.  To that end, the Directors let the Preference Period expire,

23  thus allowing the Waiver Consideration to became permanent and unavoidable.

24       96.    On or about August 12, 2009, the Directors and the Lenders agreed to restructuring

25  terms (collectively, the "Restructuring Terms"), which included that: (1) the Directors would consent

26  to the commencement of the Company's chapter 11 proceedings on September 1, 2009, a date after the

27  expiration of the preference period, but before the Gonzalez Settlement Funds were to be released from

28  escrow; and (2) the Lenders would "gift" to existing equity 2% of the new common stock and 5-year

1    warrants.  The parties agreed that other stock and warrants would be reserved for distribution pursuant

2    to management incentive plans.  Houlihan estimated that the new common stock and warrants to be

3    distributed to the current equity holders had an implied value to existing equity of between $5.6 and

4    $22.3 million, or more than four times the cash set aside to pay the unsecured creditors.

5           97.    The restructuring terms agreed to by the Company and JPMorgan were incorporated

6    into a plan support agreement (the "Plan Support Agreement") dated September 1, 2009, among the

7    Company and the Lenders.

8           98.    While the Plan Support Agreement provided equity 2% ownership of the New Common

9    Stock in the reorganized Company and warrants to purchase 10% more of the New Common Stock on

10   certain terms, it paid on account of what the Company estimated to be $300 million in general

11   unsecured claims only $5 million.  To circumvent the absolute priority rule, a "death trap" or *in*

12   *terrorem* clause was to be included in the Plan, which provided that if the general unsecured creditors

13   rejected the proposed plan, they would receive nothing.

14          99.    The Plan Support Agreement did not require payment of fees to JPMorgan in

15   connection with the Company's restructuring.  Nonetheless, the Directors agreed to pay JPMorgan $3

16   million in additional fees (the "Restructuring Fee Preference") comprised of:  (1) a $2 million

17   non-refundable work fee (the "Restructuring Work Fee"); and (2) a $1 million arrangement in

18   exchange for JPMorgan's efforts to arrange the requisite consent of the Lenders to a restructuring

19   transaction (i.e. to discharge its duties to the Lenders as their agent) (the "Restructuring Arrangement

20   Fee").  At no point did JPMorgan advise the Company that such fees were a condition of a

21   restructuring agreement with the Lenders nor was there ever a signed contract requiring payment of the

22   fees.  The Restructuring Work Fee was paid to JPMorgan on August 28, 2009, and the Restructuring

23   Arrangement Fee was paid to JPMorgan on the morning of the Petition Date, just before the petitions

24   were filed commencing the chapter 11 cases.

25          100.    As of the Petition Date, the outstanding balance under the Credit Agreement was

26   approximately $770,552,344 (plus accrued and unpaid interest), with contingent obligations of

27   approximately $1,933,100 on account of Freedom Communications' reimbursement obligations with

28   respect to issued and outstanding letters of credit.  In the first day affidavit filed by the Company's

1   CFO, the Company admitted that the book value of its assets was less than its outstanding obligations

2   under the Credit Agreement. **The Company further admitted that the fair market value of its**

3   **assets was substantially less than the book value.**

4       101.   During the Bankruptcy Proceedings, the plan proposed pursuant to the terms of the Plan

5   Support Agreement was widely viewed as unfair and illegal. For example, on December 9, 2009, the

6   acting U.S. Trustee filed an objection to the plan arguing that it impermissibly attempted to "terrorize

7   creditors from exercising their rights" and "effectively eliminate[d] application of the absolute priority

8   rule [which prohibits equity from recovery under a plan of reorganization unless creditors have been

9   paid in full]." Had the Directors fulfilled their fiduciary duties and foregone the high-stakes wagers

10  made in the sole interest of the Company's shareholders in which they squandered hundreds of millions

11  of dollars, the value of the Company upon filing would have been significantly greater and all of the

12  Company's creditors would have recovered substantially more on their claims against the Company.

13                         **V. CLAIMS FOR RELIEF**

14                          **FIRST CAUSE OF ACTION**

15        **Illegal Dividend and Unlawful Distribution - 2004 Dividend Payments**

16   **Against Baker, Bassett, Bryan, Dominguez, Flanders, Gallogly, Hardie, Masiello, Osborne,**

17         **Threshie, Tolley and Does 1 through 25 (collectively, the "2004 Directors")**

18                        **[8 Del. Code Ann. §§ 170 et seq.]**

19       102.   Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

20  as if fully set forth herein.

21       103.   At all relevant times, the 2004 Directors were directors of the Company.

22       104.   In the last two quarters of 2004, upon the approval and direction of the 2004 Directors,

23  the Company made the 2004 Dividend Payments to shareholders in an amount in excess of $6 million.

24       105.   Under Delaware law, a dividend is only legally declared and paid if it is paid out of a

25  corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the

26  dividend is declared and/or the preceding fiscal year. Delaware law defines surplus as the amount by

27  which the total assets of the corporation exceed the sum of (y) the total liabilities; and (z) the par value

28

COMPLAINT

1    of outstanding capital stock and any additional amount of stated capital (or, if the capital stock does

2    not have par value, the corporation's stated capital).  8 Del. Code Ann. § 170.

3         106.    At the time of the 2004 Dividend Payments, the Company did not have adequate

4    surplus or profits to lawfully declare and pay such dividends.  Furthermore, the Company's balance

5    sheet reflected a $130 million deficiency in shareholder equity.

6         107.    In authorizing and directing the 2004 Dividend Payments, the 2004 Directors willfully

7    or negligently caused a violation of 8 Del. Code Ann. § 173.

8         108.    Pursuant to 8 Del. Code Ann. § 174(a) this action is timely and the 2004 Directors are

9    jointly and severally liable for the amount of the 2004 Dividend Payments.

10        109.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

11    all rights, powers and authority held by the estates of the Company to prosecute this cause of action

12    and recover all losses and damages proximately caused by the conduct alleged herein.

13                         **SECOND CAUSE OF ACTION**

14        **Illegal Dividend and Unlawful Distribution -  2005 Dividend Payments**

15    **Against Baker, Bassett, Bryan, Dominguez, Flanders, Gallogly, Hardie, Masiello, Osborne,**

16          **Threshie, Tolley and Does 1 through 25 (collectively, the "2005 Directors")**

17                       **[8 Del. Code Ann. §§ 170 et seq.]**

18        110.    Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

19    as if fully set forth herein.

20        111.    At all relevant times, the 2005 Directors were directors of the Company.

21        112.    In 2005, upon the approval and direction of the 2005 Directors, the Company made the

22    2005 Dividend Payments to shareholders in an amount in excess of $12 million.

23        113.    Under Delaware law, a dividend is only legally declared and paid if it is paid out of a

24    corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the

25    dividend is declared and/or the preceding fiscal year.  Delaware law defines surplus as the amount by

26    which the total assets of the corporation exceed the sum of (y) the total liabilities; and (z) the par value

27    of outstanding capital stock and any additional amount of stated capital (or, if the capital stock does

28    not have par value, the corporation's stated capital).  8 Del. Code Ann. § 170.

114. At the time of the 2005 Dividend Payments, the Company did not have adequate surplus or profits to lawfully declare and pay such dividends. Furthermore, the Company's balance sheet reflected a massive deficiency in shareholder equity.

115. In authorizing and directing the 2005 Dividend Payments, the 2005 Directors willfully or negligently caused a violation of 8 Del. Code Ann. § 173.

116. Pursuant to 8 Del. Code Ann. § 174(a) this action is timely and the 2005 Directors are jointly and severally liable for the amount of the 2005 Dividend Payments.

117. The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things, all rights, powers and authority held by the estates of the Company to prosecute this cause of action and recover all losses and damages proximately caused by the conduct alleged herein.

**THIRD CAUSE OF ACTION**

**Illegal Dividend and Unlawful Distribution - 2006 Dividend Payments**

**Against Baker, Bassett, Bryan, Dominguez, Flanders, Greenthal, Hardie,**

**Masiello, Osborne, Spanfeller, Threshie, Tolley and Does 1 through 25**

**(collectively, the "2006 Directors")**

**[8 Del. Code Ann. §§ 170 et seq.]**

118. Plaintiff repeats and realleges each of the allegations set forth in each paragraph above as if fully set forth herein.

119. At all relevant times, the 2006 Directors were directors of the Company.

120. In 2006, upon the approval and direction of the 2006 Directors, the Company made the 2006 Dividend Payments to shareholders in an amount in excess of $12 million.

121. Under Delaware law, a dividend is only legally declared and paid if it is paid out of a corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. Delaware law defines surplus as the amount by which the total assets of the corporation exceed the sum of (y) the total liabilities; and (z) the par value of outstanding capital stock and any additional amount of stated capital (or, if the capital stock does not have par value, the corporation's stated capital). 8 Del. Code Ann. § 170.

COMPLAINT

1     122.   At the time of the 2006 Dividend Payments, the Company did not have adequate

2   surplus or profits to lawfully declare and pay such dividends. Furthermore, the Company's balance

3   sheet reflected a massive deficiency in shareholder equity.

4     123.   In authorizing and directing the 2006 Dividend Payments, the 2006 Directors willfully

5   or negligently caused a violation of 8 Del. Code Ann. § 173.

6     124.   Pursuant to 8 Del. Code Ann. § 174(a) this action is timely and the 2006 Directors are

7   jointly and severally liable for the amount of the 2006 Dividend Payments.

8     125.   The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

9   all rights, powers and authority held by the estates of the Company to prosecute this cause of action

10   and recover all losses and damages proximately caused by the conduct alleged herein.

11                   **FOURTH CAUSE OF ACTION**

12            **Breach of Fiduciary Duty - 2006 Dividend Payments**

13           **Declared and Distributed in the Last Quarter of 2006**

14                  **Against the 2006 Directors**

15     126.   Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

16   as if fully set forth herein.

17     127.   At all relevant times, the 2006 Directors were directors of the Company.

18     128.   As directors of the Company, the 2006 Directors owed the strictest fiduciary duties to

19   the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

20   furtherance of the best interests of the Company. Because the Company was insolvent immediately

21   upon the closing of the 2004 Cash Out transaction, the 2006 Directors also owed fiduciary duties for

22   the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.

23   The 2006 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care

24   toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

25     129.   The 2006 Directors breached these duties by illegally declaring and distributing the

26   2006 Dividend Payments in the last quarter of 2006 at a time when the Company was insolvent and did

27   not have adequate surplus or profits to lawfully declare and pay such dividends under Delaware law.

28

1   The 2006 Dividend Payments were made to shareholders at the expense of corporate value and the

2   Company's creditors.

3       130.   The 2006 Directors had a duty to inform themselves of the Company's true financial

4   state before making the 2006 Dividend Payments. The 2006 Directors breached this duty as, based on

5   financial and other information to which they had access, they knew, should have known, recklessly

6   disregarded, and/or should have informed themselves of the Company's insolvency and the likely

7   damage the 2006 Dividends would inflict on corporate value and the Company's creditors.

8       131.   At the time of the 2006 Dividend Payments, the Company's balance sheet reflected a

9   massive deficiency in shareholders' equity. Furthermore, the Company was severely overleveraged

10   having paid out over $1 billion in cash and taken on nearly $1 billion in debt in connection with the

11   2004 Cash Out. Given the Company's staggering debt load, lack of cash and insolvent condition, the

12   2006 Directors, had they fully informed themselves of the Company's actual financial condition, knew

13   or should have known that the Company could not afford to make the 2006 Dividend Payments.

14       132.   The 2006 Directors also had a duty of loyalty to act in the best interests of the Company

15   and its creditors and to abstain from self-dealing and pursing personal interests not shared by the

16   Company and its creditors. Directors Bassett, Bryan, Dominguez, Flanders, Greenthal, Hardie,

17   Masiello, Threshie and Tolley, who constituted the majority of the Board, were either (a) shareholders;

18   (b) directly related to shareholders; or (c) employed by shareholders of the Company. Directors and

19   their related interests received $10,701,458 in dividends in connection with the 2006 Dividend

20   Payments. Accordingly, these Directors stood to derive substantial personal benefits, either directly or

21   indirectly, from the approval and distribution of the 2006 Dividend Payments.

22       133.   Because these Directors were self-interested in the 2006 Dividend Payments, they

23   lacked the independence to act in the best interests of the Company and its creditors. Their approval of

24   the 2006 Dividend Payments was a breach of their duty of loyalty given the Company's insolvent state,

25   insufficient capital to weather fluctuations in the market, and severely impaired balance sheet; the 2006

26   Dividend Payments only benefited shareholders, and harmed the Company's and its creditors' interests.

27

28

COMPLAINT

134. The 2006 Directors who were Independent Directors breached their fiduciary duties by approving the 2006 Dividend Payments and/or permitting the Family and Investor Directors to extract millions of dollars from the Company for themselves and their constituencies. The Independent Directors, who were purportedly free from any material interest in the Company, had a duty to exercise sound business judgment for the benefit of the Company and its creditors, and counter potential self-interested acts of the Family and Investor Directors. Following the 2004 Cash Out, however, the Independent Directors did nothing to advocate the interests of the Company and its creditors. In breach of their fiduciary duties and their role as Independent Directors, they deferred to the interests of equity and permitted massive cash outflows to shareholders without regard to the Company's true financial condition.

135. As a direct and proximate result of the 2006 Directors' breaches of fiduciary duty, the Company was damaged in an amount to be determined at trial. The 2006 Directors are liable to the Company for damages and equitable remedies resulting from their breaches of fiduciary duty.

136. The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things, all rights, powers and authority held by the estates of the Company to prosecute this cause of action and recover all losses and damages proximately caused by the conduct alleged herein.

## FIFTH CAUSE OF ACTION

**Illegal Dividend and Unlawful Distribution - 2007 Dividend Payments**

**Against Baker, Bassett, Bryan, Dominguez, Flanders, Greenthal, Hardie,**

**Masiello, Osborne, Spanfeller, Threshie, Tolley and Does 1 through 25**

**(collectively, the "2007 Directors")**

**[8 Del. Code Ann. §§ 170 et seq.]**

137. Plaintiff repeats and realleges each of the allegations set forth in each paragraph above as if fully set forth herein.

138. At all relevant times, the 2007 Directors were directors of the Company.

139. In 2007, upon the approval and direction of the 2007 Directors, the Company made the 2007 Dividend Payments to shareholders in an amount in excess of $13 million.

COMPLAINT

1    140.    Under Delaware law, a dividend is only legally declared and paid if it is paid out of a

2    corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the

3    dividend is declared and/or the preceding fiscal year.  Delaware law defines surplus as the amount by

4    which the total assets of the corporation exceed the sum of (y) the total liabilities; and (z) the par value

5    of outstanding capital stock and any additional amount of stated capital (or, if the capital stock does

6    not have par value, the corporation's stated capital).  8 Del. Code Ann. § 170.

7    141.    At the time of the 2007 Dividend Payments, the Company did not have adequate

8    surplus or profits to lawfully declare and pay such dividends.  At this time, the Company's financial

9    health was rapidly deteriorating.  Revenues were plummeting as a result of the global recession and the

10    Company was struggling to meet its massive debt obligations.  Indeed, at the end of 2007, the

11    Company's books reflected a massive deficiency in shareholder equity and a net loss of nearly $1

12    million.

13    142.    In authorizing and directing the 2007 Dividend Payments, the 2007 Directors willfully

14    or negligently caused a violation of 8 Del. Code Ann. § 173.

15    143.    Pursuant to 8 Del. Code Ann. § 174(a) this action is timely and the 2007 Directors are

16    jointly and severally liable for the amount of the 2007 Dividend Payments.

17    144.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

18    all rights, powers and authority held by the estates of the Company to prosecute this cause of action

19    and recover all losses and damages proximately caused by the conduct alleged herein.

## SIXTH CAUSE OF ACTION

### Negligence - 2006 Dividend Payments

### Against the 2006 Directors

23    145.    Plaintiff repeats and realleges each of the allegations set forth above and below as if

24    fully set forth herein.

25    146.    At the time of the 2006 Dividend Payments, the 2006 Directors were directors of the

26    Company.  The 2006 Directors owed a duty to exercise reasonable care in the discharge of their duties

27    and taking actions with respect to the Company.

28

1      147.    At the time of the 2006 Dividend Payments, the Company was insolvent with a massive

2   deficiency in shareholders equity and did not have adequate surplus or net profits to lawfully declare

3   and pay such dividends.  Under these circumstances, the authorization and instruction to make the

4   2006 Dividend Payments constituted a failure to use reasonable care.

5      148.    The 2006 Directors' failure to use reasonable care in the discharge of their duties and

6   taking action with respect to the Company directly and proximately cause substantial harm to the

7   Company in an amount to be determined at trial.

8      149.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

9   all rights, powers and authority held by the estates of the Company to prosecute this cause of action

10   and recover all losses and damages proximately caused by the conduct alleged herein.

11                              **SEVENTH CAUSE OF ACTION**

12                   **Breach of Fiduciary Duty - 2007 Dividend Payments**

13                              **Against the 2007 Directors**

14      150.    Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

15   as if fully set forth herein.

16      151.    At all relevant times, the 2007 Directors were directors of the Company.

17      152.    As directors of the Company, the 2007 Directors owed the strictest fiduciary duties to

18   the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

19   furtherance of the best interests of the Company.  Because the Company was insolvent immediately

20   upon the closing of the 2004 Cash Out transaction, the 2007 Directors also owed fiduciary duties for

21   the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.

22   The 2007 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care

23   toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

24      153.    The 2007 Directors breached these duties by illegally declaring and distributing the

25   2007 Dividend Payments at a time when the Company was insolvent and did not have adequate

26   surplus or profits to lawfully declare and pay such dividends under Delaware law.  The 2007 Dividend

27   Payments were made to shareholders at the expense of corporate value and the Company's creditors.

28

COMPLAINT

1    154.   The 2007 Directors had a duty to inform themselves of the Company's true financial

2   state before making the 2007 Dividend Payments. The 2007 Directors breached this duty as, based on

3   financial and other information to which they had access, they knew, should have known, recklessly

4   disregarded, and/or should have informed themselves of the Company's insolvency and inability to

5   make a dividend payment in a year in which the Company was losing money and getting closer to

6   breaching its financial covenants with the Lenders.

7    155.   At the time of the 2007 Dividend Payments, the Company's balance sheet reflected a

8   massive deficiency in shareholders' equity. The Company was severely overleveraged having paid out

9   over $1 billion in cash and taken on nearly $1 billion in debt in connection with the 2004 Cash Out.

10  At this time, the Company was also struggling to survive the global recession, which had no prospects

11  of improvement in the near future, and plummeting revenues. Indeed, at the end of 2007, the

12  Company posted nearly $1 million in net losses. Given the Company's insolvency, staggering debt

13  load, lack of cash and falling revenue, the 2007 Directors, had they fully informed themselves of the

14  Company's actual financial condition, knew or should have known that the Company could not afford

15  to make the 2007 Dividend Payments.

16   156.   The 2007 Directors also had a duty of loyalty to act in the best interests of the Company

17  and its creditors and to abstain from self-dealing and pursing personal interests not shared by the

18  Company and its creditors. Directors Bassett, Bryan, Dominguez, Flanders Greenthal, Hardie,

19  Masiello, Threshie, and Tolley, who constituted the majority of the Board, were either (a)

20  shareholders; (b) directly related to shareholders; or (c) employed by shareholders of the Company.

21  Directors and their related interests received $10,701,458 in dividends in connection with the 2007

22  Dividend Payments. Accordingly, these Directors stood to derive substantial personal benefits, either

23  directly or indirectly, from the approval and distribution of the 2007 Dividend Payments.

24   157.   Because these Directors were self-interested in the 2007 Dividend Payments, they

25  lacked the independence to act in the best interests of the Company and its creditors. Their approval of

26  the 2007 Dividend Payments was a breach of their duty of loyalty given the Company's insolvent state,

27  insufficient capital to weather fluctuations in the market, and severely impaired balance sheet; the 2007

28  Dividend Payments only benefited shareholders, and harmed the Company's and its creditors' interests.

158.   The 2007 Directors who were Independent Directors breached their fiduciary duties by approving the 2007 Dividend Payments and/or permitting the Family and Investor Directors to extract millions of dollars from the Company for themselves and their constituencies.  The Independent Directors, who were purportedly free from any material interest in the Company, had a duty to exercise sound business judgment for the benefit of the Company and its creditors, and counter potential self-interested acts of the Family and Investor Directors.  Following the 2004 Cash Out, however, the Independent Directors did nothing to advocate the interests of the Company and its creditors.  In breach of their fiduciary duties and their role as Independent Directors, they deferred to the interests of equity and permitted massive cash outflows to shareholders without regard to the Company's true financial condition.

159.   As a direct and proximate result of the 2007 Directors' breaches of fiduciary duty, the Company was damaged in an amount in excess of $13 million, to be determined at trial.  The 2007 Directors are liable to the Company for damages and equitable remedies resulting from their breaches of fiduciary duty.

160.   The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things, all rights, powers and authority held by the estates of the Company to prosecute this cause of action and recover all losses and damages proximately caused by the conduct alleged herein.

## EIGHTH CAUSE OF ACTION

### Negligence - 2007 Dividend Payments

### Against the 2007 Directors

161.   Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

162.   At the time of the 2007 Dividend Payments, the 2007 Directors were directors of the Company.  The 2007 Directors owed a duty to exercise reasonable care in the discharge of their duties and taking actions with respect to the Company.

163.   At the time of the 2007 Dividend Payments, the Company was insolvent with a massive deficiency in shareholders equity and did not have adequate surplus or net profits to lawfully declare and pay such dividends.  The Company was struggling to weather the unexpected recession, and

COMPLAINT

1   posted a net loss of nearly $1 million. Under these circumstances, the authorization and instruction to

2   make the 2007 Dividend Payments constituted a failure to use reasonable care.

3          164.   The 2007 Directors' failure to use reasonable care in the discharge of their duties and

4   taking action with respect to the Company directly and proximately cause substantial harm to the

5   Company in an amount to be determined at trial.

6          165.   The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

7   all rights, powers and authority held by the estates of the Company to prosecute this cause of action

8   and recover all losses and damages proximately caused by the conduct alleged herein.

9                                **NINTH CAUSE OF ACTION**

10          **Illegal Dividend and Unlawful Distribution - 2008 Dividend Payments**

11   **Against Basset, Baker, Bryan, Flanders, Greenthal, Hardie, Osborne, Philibbosian, Spanfeller,**

12              **Tolley, Wallace and Does 1 through 25 (collectively, the "2008 Directors")**

13                              **[8 Del. Code Ann. §§ 170 *et seq.*]**

14          166.   Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

15   as if fully set forth herein.

16          167.   At all relevant times, the 2008 Directors were directors of the Company.

17          168.   In 2008, upon the approval and direction of the 2008 Directors, the Company made the

18   2008 Dividend Payments to shareholders in an amount in excess of $3 million.

19          169.   Under Delaware law, a dividend is only legally declared and paid if it is paid out of a

20   corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the

21   dividend is declared and/or the preceding fiscal year. Delaware law defines surplus as the amount by

22   which the total assets of the corporation exceed the sum of (y) the total liabilities; and (z) the par value

23   of outstanding capital stock and any additional amount of stated capital (or, if the capital stock does

24   not have par value, the corporation's stated capital). 8 Del. Code Ann. § 170.

25          170.   At the time of the 2008 Dividend Payments, the Company did not have adequate

26   surplus or profits to lawfully declare and pay such dividends. The Company was so deeply entrenched

27   in insolvency that the 2008 Directors acknowledged that covenant defaults were inevitable in 2008.

28

1    By the end of 2008, negative shareholder equity had skyrocketed to more than 500% to negative $269

2    million and the Company posted a net loss of more than $166 million.

3        171.    The 2008 Directors willfully or negligently violated 8 Del. Code Ann. § 173 by

4    authorizing and directing the 2008 Dividend Payments at a time when the Company was insolvent and

5    on a fast track to bankruptcy.

6        172.    Pursuant to 8 Del. Code Ann. § 174(a) this action is timely and the 2008 Directors are

7    jointly and severally liable for the amount of the 2008 Dividend Payments.

8        173.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

9    all rights, powers and authority held by the estates of the Company to prosecute this cause of action

10    and recover all losses and damages proximately caused by the conduct alleged herein.

11 **TENTH CAUSE OF ACTION**

12 **Breach of Fiduciary Duty - 2008 Dividend Payments**

13 **Against the 2008 Directors**

14        174.    Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

15    as if fully set forth herein.

16        175.    At all relevant times, the 2008 Directors were directors of the Company.

17        176.    As directors of the Company, the 2008 Directors owed the strictest fiduciary duties to

18    the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

19    furtherance of the best interests of the Company. Because the Company was insolvent immediately

20    upon the closing of the 2004 Cash Out transaction, the 2008 Directors also owed fiduciary duties for

21    the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.

22    The 2008 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care

23    toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

24        177.    The 2008 Directors breached these duties by illegally declaring and distributing the

25    2008 Dividend Payments at a time when the Company was insolvent and did not have adequate

26    surplus or profits to lawfully declare and pay such dividends under Delaware law. The 2008 Dividend

27    Payments were made to shareholders at the expense of corporate value and the Company's creditors.

28

1    178.   The 2008 Directors had a duty to inform themselves of the Company's true financial

2   state before making the 2008 Dividend Payments.  The 2008 Directors breached this duty as, based on

3   financial and information to which they had access, they knew, should have known, recklessly

4   disregarded, and/or should have informed themselves of the Company's insolvency and inability to

5   make a dividend payment in a year in which the Company was losing money and breached its financial

6   covenants with the Lenders.

7    179.   At the time of the 2008 Dividend Payments, the Company's balance sheet reflected a

8   massive negative shareholders' equity of $269 million, a deficiency more than 500% higher than in the

9   previous year.  The Company was severely overleveraged having paid out over $1 billion in cash and

10   taken on nearly $1 billion in debt in connection with the 2004 Cash Out.  The Directors knew or

11   should have known that the Company faced a high likelihood of defaulting on its the covenants under

12   the Credit Agreement by June 20, 2008 and that it would definitely default by September 30, 2008.

13   Given the Company's insolvency, staggering debt load, lack of cash, falling revenue and imminent

14   covenant defaults, the 2008 Directors, had they fully informed themselves of the Company's actual

15   financial condition, knew or should have known that the Company could not afford to make the 2008

16   Dividend Payments.

17    180.   The 2008 Directors also had a duty of loyalty to act in the best interests of the Company

18   and its creditors and to abstain from self-dealing and pursing personal interests not shared by the

19   Company and its creditors.  Directors Bassett, Bryan, Flanders, Greenthal, Hardie, Masiello, Tolley

20   and Wallace, who constituted the majority of the Board, were either (a) shareholders; (b) directly

21   related to shareholders; or (c) employed by shareholders of the Company.  Directors and their related

22   interests received $2,794,894 in dividends in connection with the 2008 Dividend Payments.

23   Accordingly, these Directors stood to derive substantial personal benefits, either directly or indirectly,

24   from the approval and distribution of the 2008 Dividend Payments.

25    181.   Because these Directors were self-interested in the 2008 Dividend Payments, they

26   lacked the independence to act in the best interests of the Company and its creditors.  Their approval of

27   the 2008 Dividend Payments was a breach of their duty of loyalty given the Company's insolvent state,

28   insufficient capital to weather fluctuations in the market, severely impaired balance sheet and

1   imminent default on its debt covenants with the Lenders; the 2008 Dividend Payments only benefited

2   shareholders, and harmed the Company's and its creditors' interests.

3       182.   The 2008 Directors who were Independent Directors breached their fiduciary duties by

4   approving the 2008 Dividend Payments and/or permitting the Family and Investor Directors to extract

5   millions of dollars from the Company for themselves and their constituencies.  The Independent

6   Directors, who were purportedly free from any material interest in the Company, had a duty to exercise

7   sound business judgment for the benefit of the Company and its creditors, and counter potential

8   self-interested acts of the Family and Investor Directors.   Following the 2004 Cash Out, however, the

9   Independent Directors did nothing to advocate the interests of the Company and its creditors.  In

10  breach of their fiduciary duties and their role as Independent Directors, they deferred to the interests of

11  equity and permitted massive cash outflows to shareholders without regard to the Company's true

12  financial condition.

13      183.   The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

14  all rights, powers and authority held by the estates of the Company to prosecute this cause of action

15  and recover all losses and damages proximately caused by the conduct alleged herein.

16  **ELEVENTH CAUSE OF ACTION**

17  **Negligence - 2008 Dividend Payments**

18  **Against the 2008 Directors**

19      184.   Plaintiff repeats and realleges each of the allegations set forth above and below as if

20  fully set forth herein.

21      185.   At the time of the 2008 Dividend Payments, the 2008 Directors were directors of the

22  Company, and as such, owed a duty to exercise reasonable care in the discharge of duties and taking

23  actions with respect to the Company.

24      186.   At the time of the 2008 Dividend Payments, the Company was insolvent with a massive

25  deficiency in shareholders equity and did not have adequate surplus or net profits to lawfully declare

26  and pay such dividends.  The Company posted a net loss of $166 million and was anticipating

27  covenant defaults by no later than September 30, 2008.  Under these circumstances, the authorization

28  and instruction to make the 2008 Dividend Payments constituted a failure to use reasonable care.

1      187.    The 2008 Directors' failure to use reasonable care in the discharge of their duties and

2      taking action with respect to the Company directly and proximately cause substantial harm to the

3      Company in an amount to be determined at trial.

4      188.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

5      all rights, powers and authority held by the estates of the Company to prosecute this cause of action

6      and recover all losses and damages proximately caused by the conduct alleged herein.

7                              **TWELFTH CAUSE OF ACTION**

8                    **Breach of Fiduciary Duty - Failure to Preserve the Company's**

9                              **Fraudulent Transfer Causes of Action**

10                                **Against the 2008 Directors**

11     189.    Plaintiff repeats and realleges each of the allegations set forth above and below as if

12     fully set forth herein.

13     190.    At all relevant times, the 2008 Directors were directors of the Company.

14     191.    As directors of the Company, the 2008 Directors owed the strictest fiduciary duties to

15     the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

16     furtherance of the best interests of the Company.  Because the Company was insolvent immediately

17     upon the closing of the 2004 Cash Out transaction, the 2008 Directors also owed fiduciary duties for

18     the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.

19     The 2008 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care

20     toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

21     192.    Given the Company's insolvency, the 2008 Directors had a duty to inform themselves of

22     the Company's true financial state and preserve the value of the Company's assets for the benefit of

23     creditors.  The 2008 Directors breached this duty as, based on financial and other information to which

24     they had access, they knew, should have known, recklessly disregarded, and/or should have informed

25     themselves of the Company's insolvency, the existence of potential fraudulent transfer causes of action

26     based on the obligations incurred during the 2004 Cash Out (the "2004 Fraudulent Transfer Causes of

27     Action"), and that the Company needed to file its petition for chapter 11 protection by May 18, 2008 in

28     order to preserve the 2004 Fraudulent Transfer Causes of Action.

COMPLAINT

1    193.   The obligations incurred by the Company in connection to the 2004 Cash Out were

2    likely fraudulent transfers under section 544 of the Bankruptcy Code and applicable state law as the

3    Company did not receive reasonably equivalent value for the obligations it incurred and the 2004 Cash

4    Out rendered the Company insolvent and left it with unreasonably small capital.

5    194.   Based on the Company's financial records and other readily available information, the

6    2008 Directors had knowledge, or had reason to know that the Company did not receive fair or

7    equivalent value in exchange for the obligations it incurred in connection to the 2004 Cash Out.

8    Pursuant to the 2004 Cash Out, the Company took on approximately $900 million in loans, but

9    retained a mere $20 million at the conclusion of the transaction.  Pursuant to the 2004 Cash Out,

10   approximately $1.024 billion that were paid out directly to the Hoiles Family, B/P and other financial

11   advisors.  The Company received no value in return.

12   195.   Based on the Company's financial records and other available information, the 2008

13   Directors also had knowledge, or had reason to know that the 2004 Cash Out left the Company

14   insolvent and/or left with unreasonably small capital.  After the 2004 Cash Out, the Company's

15   stockholder equity decreased from over $350 million on March 31, 2004 to an estimated deficiency of

16   $130 million on December 31, 2004.  The Company's debt to adjusted EBITDA ratio increased to

17   almost three times what it was prior to the transaction.  Indeed, the Company had projected a negative

18   net asset value of almost $180 million on or about March 31, 2004.

19   196.   Based on the foregoing information, the 2008 Directors had knowledge, or had reason

20   to know that there were more than $1 billion of potential fraudulent transfer claims.  The 2008

21   Directors also had knowledge that the 2004 Fraudulent Transfer Causes of Action would expire on the

22   fourth anniversary of the 2004 Cash Out.  In view of the Company's insolvency, struggles to service an

23   oppressive debt load during an unprecedented economic downturn, and high risk of default on its June

24   30, 2008 debt covenants, substantial restructuring was inevitable.  Accordingly, the 2008 Directors had

25   a duty to cause the Company to file its petition for chapter 11 bankruptcy within the four-year

26   limitations period provided for the 2004 Fraudulent Causes of Action under Delaware law, i.e. by or

27   about May 17, 2008 and preserve such causes of action for the benefit of the Company and its

28   creditors.  The 2008 Directors breached their fiduciary duties by failing to cause the Company to

1    timely file for chapter 11 before May 17, 2008 and preserve the 2004 Fraudulent Transfer Causes of

2    Action.  By failing to do so, the 2008 Directors failed to preserve and wasted a substantial asset of the

3    Company that could have increased recovery for creditors.

4         197.    The 2008 Directors also had a duty of loyalty to act in the best interests of the Company

5    and its creditors and to abstain from self-dealing and pursing personal interests not shared by the

6    Company and its creditors.  Directors Flanders, Bassett, Bryan, Wallace, Greenthal, Hardie, Threshie,

7    and Tolley who constituted the majority of the Board, were either (a) shareholders; (b) directly related

8    to shareholders; or (c) employed by shareholders of the Company.  Their and their constituencies'

9    interests in the Company would have been completely wiped out by a bankruptcy filing in 2008, as the

10   Bankruptcy Code prohibits the holders of equity interests to retain or receive any value on account of

11   such interests unless and until the unsecured creditors have been paid in full.  Furthermore, any

12   recovery of funds based on the 2004 Fraudulent Transfer Causes of Action would have been from

13   relatives of the Family Directors.  Driven by their self-interest, the Family and Investor Directors

14   delayed the Company's bankruptcy filing until after the statute of limitations had expired on the 2004

15   Fraudulent Transfer Causes of Action.  The 2008 Family and Investor Directors knew, or should have

16   known, that causing the Company to file for chapter 11 by May 17, 2008 was in the best interest of the

17   Company and its creditors.  Failing to do so was a breach of their fiduciary duty, and in particular, their

18   duty of loyalty.

19        198.    The 2008 Directors who were Independent Directors breached their fiduciary duties by

20   failing to preserve the 2004 Fraudulent Transfer Causes of Action.  The Independent Directors, who

21   were purportedly free from any material interest in the Company, had a duty to exercise sound business

22   judgment for the benefit of the Company and its creditors, and counter potential self-interested acts of

23   the Family and Investor Directors.   Following the 2004 Cash Out, however, the Independent Directors

24   did nothing to advocate the interests of the Company and its creditors.  In breach of their fiduciary

25   duties and their role as Independent Directors, they deferred to the interests of equity and allowed over

26   a $1 billion of potential fraudulent transfer claims to expire notwithstanding the Company's hopelessly

27   insolvent state.

28

COMPLAINT

1    199.    As a direct and proximate result of the 2008 Directors' breaches of fiduciary duty

2    relating to their failure to make inquiry into and preserve the 2004 Fraudulent Transfer Causes of

3    Action, the Company was damaged in an amount to be determined at trial.  The 2008 Directors are

4    liable to the Company for damages and equitable remedies resulting from their breaches of fiduciary

5    duty.

6    200.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

7    all rights, powers and authority held by the estates of the Company to prosecute this cause of action

8    and recover all losses and damages proximately caused by the conduct alleged herein.

## THIRTEENTH CAUSE OF ACTION

### Breach of Fiduciary Duty - the Waiver Agreement

**Against Basset, Baker, Bryan, Flanders, Greenthal, Hardie, Osborne, Philibbosian, Spanfeller,**

**Tolley, Wallace and Does 1 through 25 (the "2009 Directors")**

13    201.    Plaintiff repeats and realleges each of the allegations set forth in each paragraph above

14    as if fully set forth herein.

15    202.    At all relevant times, the 2009 Directors were directors of the Company.

16    203.    As directors of the Company, the 2009 Directors owed the strictest fiduciary duties to

17    the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

18    furtherance of the best interests of the Company.  Because the Company was insolvent immediately

19    upon the closing of the 2004 Cash Out transaction and remained insolvent through 2009, the 2009

20    Directors also owed fiduciary duties for the benefit of the Company's creditors, who were the residual

21    risk bearers, at all times relevant hereto.  The 2009 Directors had fiduciary duties to act with the

22    utmost good faith, fair dealing and due care toward the Company's creditors and in furtherance of the

23    best interests of the Company's creditors.

24    204.    The 2009 Directors breached these duties by causing the Company to enter into the

25    Waiver Agreement.  The Waiver Agreement caused the Company to expend tens of millions of dollars

26    and grant liens in substantially all of the Unencumbered Cash, but provided no value to the Company

27    and was detrimental to creditors' interests.

28

208. The Family and Investor Directors knew that an immediate chapter 11 filing by the Company was necessary to preserve the value of the Company for the benefit of its creditors. However, in the event of an immediate restructuring of the Company, these Directors' and their constituencies' interests in the Company would be completely wiped out as the Bankruptcy Code prohibits the holders of equity interests to retain or receive any value on account of such interests unless and until the unsecured creditors have been paid in full. The 2009 Family and Investor Directors breached their duty of loyalty by causing the Company to enter into the Waiver Agreement to delay the Company's bankruptcy filing. Gambling on the off chance that the Company's valuation would improve sufficiently over the waiver period to provide some recovery for equity, these Directors caused the Company to enter into the Waiver Agreement, which cost tens of millions of dollars and resulted in the turnover to Lenders of the Unencumbered Cash, which would have been a valuable source of recovery for unsecured creditors.

209. The 2009 Directors who were Independent Directors breached their fiduciary duties by allowing the Company to enter into the Waiver Agreement for the benefit of shareholders. The Independent Directors, who were purportedly free from any material interest in the Company, had a duty to exercise sound business judgment for the benefit of the Company and its creditors, and counter potential self-interested acts of the Family and Investor Directors. Following the 2004 Cash Out, however, the Independent Directors did nothing to advocate the interests of the Company and its creditors. In breach of their fiduciary duties and their role as Independent Directors, they deferred to the interests of equity and approved the Waiver Agreement without regard to the Company's true financial condition and the interests of the Company's creditors.

210. As a direct and proximate result of the 2009 Directors' breaches of fiduciary duty relating to their authorization of the Waiver Agreement, the Company was damaged in an amount to be determined at trial. The 2009 Directors are liable to the Company for damages and equitable remedies resulting from their breaches of fiduciary duty.

211. The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things, all rights, powers and authority held by the estates of the Company to prosecute this cause of action and recover all losses and damages proximately caused by the conduct alleged herein.

## FOURTEENTH CAUSE OF ACTION

### Breach of Fiduciary Duty - Failure to Preserve the Company's

### Preferential Transfer Causes of Action

### Against the 2009 Directors

212.    Plaintiff repeats and realleges each of the allegations set forth in each paragraph above as if fully set forth herein.

213.    At all relevant times, the 2009 Directors were directors of the Company.

214.    As directors of the Company, the 2009 Directors owed the strictest fiduciary duties to the Company, including the duties to act with good faith, loyalty, and due care toward the Company in furtherance of the best interests of the Company.  Because the Company was insolvent immediately upon the closing of the 2004 Cash Out transaction and remained insolvent through 2009, the 2009 Directors also owed fiduciary duties for the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.  The 2009 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

215.    Given the Company's insolvency, the 2009 Directors had a duty of care to inform themselves of the Company's true financial state and preserve the value of the Company's assets for the benefit of creditors.  The 2009 Directors breached this duty as, based on financial and other information to which they had access, they knew, should have known, recklessly disregarded, and/or should have informed themselves of the Company's insolvency, the existence of potential preferential transfer causes of action based on the Waiver Consideration paid out in connection to the Waiver Agreement (the "Preference Claims"), and that the Company needed to file its petition for chapter 11 protection by July 29, 2009 in order to preserve the Preference Claims.

216.    The Waiver Consideration was likely a preferential transfer under section 547 of the Bankruptcy Code as it was transferred at a time when the Company was insolvent, to or for the benefit of a creditor for or on account of an antecedent debt owed by the Company before such transfer was made, which enabled the creditor to receive more than such creditor would have received under the Bankruptcy Code.

48

Exhibit A

COMPLAINT

1    217.   Based on the Company's financial records and other readily available information, the

2    2009 Directors had knowledge, or had reason to know that the Company was insolvent and in

3    immediate need of chapter 11 restructuring at the time the Waiver Consideration was paid to the

4    Lenders.  The Company's finances were crippled by its massive debt load and the downturn in the print

5    media market, which showed no signs of letting up.  The Company's losses were continuing to worsen

6    notwithstanding management's aggressive cost-reduction campaign and the Company's operating

7    results were continuing to miss every projection.  Indeed, the Company's financial advisor counseled

8    the 2009 Directors that the Company needed a comprehensive restructuring, and strongly advised

9    against entering into the Waiver Agreement.

10   218.   Based on the Company's financial records and other available information, the 2009

11   Directors had knowledge, or had reason to know that the Waiver Consideration was being paid to the

12   Lenders on account of an antecedent debt - the Company's obligations under the Credit Agreement.

13   The 2009 Directors also had knowledge that the Waiver Consideration provided the Lenders with

14   greater recovery than if the Waiver Consideration was never transferred or if the Lenders were to

15   receive payment to the extent provided under the Bankruptcy Code.  The Waiver Consideration

16   provided greater recovery to the Lenders in the form of fees, an interest rate increase, accelerated

17   amortization payments, revolver repayment and permanent reduction, and entry into control

18   agreements with respect to certain of the Company's accounts.

19   219.   Based on the foregoing information, the 2009 Directors had knowledge, or had reason

20   to know that there were nearly $180 million in potential preference claims.  The 2009 Directors also

21   had knowledge that the Preference Claims would expire on July 29, 2009.  Indeed, the Company's

22   financial advisor explicitly alerted the 2009 Directors that the Waiver Consideration was a preferential

23   transfer.  The financial advisor also explicitly informed the 2009 Directors that the Company needed to

24   file for bankruptcy by July 29, 2009 in order to preserve the Preference Claims.

25   220.   In view of the Company's insolvency and ever deteriorating financial state, including

26   defaults on its debt covenants since September 30, 2008, substantial restructuring was inevitable.

27   Accordingly, the 2009 Directors had a duty to cause the Company to file its petition for chapter 11

28   bankruptcy before the expiration of the Preference Period and preserve the Preference Claims for the

COMPLAINT

1   benefit of the Company and its creditors.  By intentionally and/or negligently failing to do so, the 2009

2   Directors wasted substantial assets of the Company that could have increased recovery for creditors.

3   The 2009 Directors also had a duty of loyalty to act in the best interests of the Company, and to abstain

4   from self-dealing and the pursuit of personal interests not shared by the Company and its creditors.  At

5   times relevant to the Company's failure to timely file for bankruptcy in order to preserve the Preference

6   Claims, Directors Flanders, Bassett, Bryan, Wallace, Greenthal, Hardie, Osborne, Threshie, and Tolley

7   (a) personally owned; (b) were related to those who owned; or (c) were employed by the owners of

8   100% of the outstanding equity interests of the Company.  Accordingly, these Directors had an interest

9   to engage in acts that would secure value for their and their constituencies' interests in the Company.

10      221.   Since the time the Waiver Consideration was transferred to the Lenders, the 2009

11   Family and Investor Directors knew that an immediate chapter 11 filing was necessary to preserve the

12   value of the Company for the benefit of its creditors.  However, in the event of an immediate

13   restructuring of the Company, these Directors' and their constituencies' interests would be completely

14   wiped as the Bankruptcy Code prohibits equity holders from retaining or receiving any value on

15   account of their interests unless and until the unsecured creditors have been paid in full.  The 2009

16   Family and Investor Directors breached their duty of loyalty by failing to immediately cause the

17   Company to file for chapter 11, and delaying the Company's filing until after the expiration of the

18   Preference Period to further their and their constituencies' interest of negotiating with the Lenders a

19   recovery for out of the money shareholders.  Because the Preference Claims would be recovered from

20   the Lenders, the 2009 Family and Investor Directors hoped that by allowing the Preference Period to

21   expire, they would curry favor with the Lenders to agree to a restructuring plan that provided some

22   recovery for equity.  The 2009 Family and Investor Directors breached their duty of loyalty by

23   negligently, willfully or intentionally permitting the Preference Period to expire and wasting nearly

24   $180 million of the Company's assets in furtherance of their self-interest.

25      222.   The 2009 Directors who were Independent Directors breached their fiduciary duties by

26   causing the Company to delay its bankruptcy filing until after the Period Preference had run and

27   thereby failing to preserve the Preference Claims, which would have provided greater recovery for the

28   Company's creditors.  The Independent Directors, who were purportedly free from any material interest

COMPLAINT

1  in the Company, had a duty to exercise sound business judgment for the benefit of the Company and

2  its creditors, and counter potential self-interested acts of the Family and Investor Directors.   Following

3  the 2004 Cash Out, however, the Independent Directors did nothing to advocate the interests of the

4  Company and its creditors.  In breach of their fiduciary duties and their role as Independent Directors,

5  they deferred to the interests of equity and allowed the Preference Claims to expire without regard to

6  the Company's and its creditors' interests.

7        223.   As a direct and proximate result of the 2009 Directors' breaches of fiduciary duty

8  relating to their failure to protect the Company's rights with respect to the Waiver Consideration, the

9  Company was damaged in an amount not less than $180 million to be determined at trial.  The 2009

10  Directors are liable to the Company for damages and equitable remedies resulting from their breaches

11  of fiduciary duty.

12        224.   The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things,

13  all rights, powers and authority held by the estates of the Company to prosecute this cause of action

14  and recover all losses and damages proximately caused by the conduct alleged herein.

15  **FIFTEENTH CAUSE OF ACTION**

16  **Breach of Fiduciary Duty - Payment of $3 Million to JPMorgan**

17  **Against the 2009 Directors**

18        225.   Plaintiff repeats and realleges each of the allegations set forth above and below as if

19  fully set forth herein.

20        226.   At all relevant times, the 2009 Directors were directors of the Company.

21        227.   As directors of the Company, the 2009 Directors owed the strictest fiduciary duties to

22  the Company, including the duties to act with good faith, loyalty, and due care toward the Company in

23  furtherance of the best interests of the Company.  Because the Company was insolvent immediately

24  upon the closing of the 2004 Cash Out transaction, the 2009 Directors also owed fiduciary duties for

25  the benefit of the Company's creditors, who were the residual risk bearers, at all times relevant hereto.

26  The 2009 Directors had fiduciary duties to act with the utmost good faith, fair dealing and due care

27  toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

28

228.    The 2009 Directors had a duty to act in the best interests of the Company and to preserve its assets for the benefit of its creditors. The 2009 Directors authorized and/or intentionally or negligently failed to prevent payment of the $3 million Restructuring Fee. Because the $3 million Restructuring Fee constituted waste, rendered no value whatsoever to the Company, and was paid only as a further concession to JPMorgan on an already-completed arrangement that impermissibly provided some recovery to out of the money equity holders, the 2009 Directors breached their fiduciary duties in their acts and omissions with respect to the Restructuring Fee.

229.    The 2009 Directors had a duty of loyalty to abstain from self-dealing and the pursuit of personal interests not shared by the Company and its creditors. Directors Bassett, Bryan, Wallace, Greenthal, Hardie, Osborne, Threshie, and Tolley were either (a) shareholders; (b) directly related to shareholders; or (c) employed by shareholders of the Company. As such, they were interested in any transaction which did or was intended to benefit shareholders' interests at the expense of the Company. Such Directors breached their fiduciary duties by authorizing the Company to pay the $3 million Restructuring Fee to JPMorgan.

230.    The 2009 Directors who were Independent Directors breached their fiduciary duties by approving the Restructuring Fee and/or permitting the Family and Investor Directors to waste millions of dollars of the Company's assets in furtherance of shareholders' interests. The Independent Directors, who were purportedly free from any material interest in the Company, had a duty to exercise sound business judgment for the benefit of the Company and its creditors, and counter potential self-interested acts of the Family and Investor Directors. Following the 2004 Cash Out, however, the Independent Directors did nothing to advocate the interests of the Company and its creditors. In breach of their fiduciary duties and their role as Independent Directors, they deferred to the interests of equity and permitted Company to pay the $3 million Restructuring Fee to JPMorgan.

231.    As a direct and proximate result of the 2009 Directors' breaches of fiduciary duty relating to their authorization of and/or intentional or negligent failure to prevent payment of the Restructuring Fee, the Company was damaged in the amount of at least $3 million. The 2009 Directors are liable to the Company for damages and equitable remedies resulting from their breaches of fiduciary duty.

232.    The FCH Litigation Trust, acting through Plaintiff, was assigned, among other things, all rights, powers and authority held by the estates of the Company to prosecute this cause of action and recover all losses and damages proximately caused by the conduct alleged herein.

### PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### ON ALL CAUSES OF ACTION:

1.    For compensatory damages in an amount not less than $180 million or according to proof at trial;

2.    For interest at the maximum rate allowable by law;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court may deem just and proper.

Dated: May 5, 2010

CALLAHAN & BLAINE, APLC

By: _____
    Daniel J. Callahan
    Brian J. McCormack
    David J. Darnell
Attorneys for Plaintiff
JAMES SKORHEIM, as Litigation Trustee
of the FCH Litigation Trust

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all factual issues arising hereunder.

Dated: May 5, 2010

CALLAHAN & BLAINE, APLC

By: _____
    Daniel J. Callahan
    Brian J. McCormack
    David J. Darnell
Attorneys for Plaintiff
JAMES SKORHEIM, as Litigation Trustee
of the FCH Litigation Trust

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Daniel J. Callahan, Esq. (SBN 91490)
Brian J. McCormack, Esq. (SBN 164547)
Callahan & Blaine, APLC
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
TELEPHONE NO.: (714) 241-4444   FAX NO.: (714) 241-4445
ATTORNEY FOR (Name): Plaintiff: James Skorheim

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 05 2010

ALAN CARLSON, Clerk of the Court

BY J. HAINES, DEPUTY

Clerk of the Superior Court
Civil Complex Center
751 W. Santa Ana Blvd.
Santa Ana, Ca 92701

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

CASE NAME: Skorheim v. Flanders, et al

CASE NUMBER:
**30-2010**
**00369301**

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: **JUDGE NANCY WIEBEN STOCK** **DEPT. CX105** |

Items 1–6 below must be completed (see instructions on page 2).

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | Real Property | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| Non-PI/PD/WD (Other) Tort | [ ] Wrongful eviction (33) | Enforcement of Judgment |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | Unlawful Detainer | Miscellaneous Civil Complaint |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | Miscellaneous Civil Petition |
| [ ] Professional negligence (25) | Judicial Review | [ ] Partnership and corporate governance (21) |
| [X] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition (not specified above) (43) |
| Employment | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties   d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve       in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive

4. Number of causes of action (specify): Fifteen (15)

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: May 5, 2010

Daniel J. Callahan, Esq.
(TYPE OR PRINT NAME)                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|

Legal Solutions Plus

58

Exhibit A

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State-Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Daniel J. Callahan, Esq. (SBN 91490)
Brian J. McCormack, Esq. (SBN 164547)
Callahan & Blaine, APLC
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707
  TELEPHONE NO.: (714) 241-4444   FAX NO. *(Optional):* (714) 241-4445
E-MAIL ADDRESS *(Optional):* bmccormack@callahan-law.com
ATTORNEY FOR *(Name):* Plaintiff: James Skorheim

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 05 2010

ALAN CARLSON, Clerk of the Court

BY _____ J. HAINES _____ ,DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
  STREET ADDRESS: ~~700 Civic Center Drive West~~ **Clerk of the Superior Court**
  MAILING ADDRESS: **Civil Complex Center**
  CITY AND ZIP CODE: Santa Ana, CA 92701 **751 W. Santa Ana Blvd.**
  BRANCH NAME: ~~Central Justice Center~~ **Santa Ana, Ca 92701**

30-2010

PLAINTIFF/PETITIONER: JAMES SKORHEIM, as Litigation Trustee
for the FCH Litigation Trust

DEFENDANT/RESPONDENT: SCOTT N. FLANDERS, an individual; et
al.

CASE NUMBER:

00369301

JUDICIAL OFFICER:

| NOTICE OF RELATED CASE | JUDGE NANCY WIEBEN STOCK DEPT. CX105 |
|---|---|

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: NELSON GONZALEZ, et al. v. FREEDOM COMMUNICATIONS, INC.

   b. Case number: 03CC08756

   c. Court: [ X ] same as above
      [ ] other state or federal court *(name and address):*

   d. Department: CX-101

   e. Case type: [ ] limited civil   [ X ] unlimited civil   [ ] probate   [ ] family law   [ ] other *(specify):*

   f. Filing date: July 7, 2003

   g. Has this case been designated or determined as "complex?"   [ X ] Yes   [ ] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      [ X ]  involves the same parties and is based on the same or similar claims.

      [ X ]  arises from the same or substantially identical transactions, incidents, or events requiring the determination of
             the same or substantially identical questions of law or fact.

      [ X ]  involves claims against, title to, possession of, or damages to the same property.

      [ X ]  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

             [ ]  Additional explanation is attached in attachment 1h

   i. Status of case:

      [ X ]  pending
      [ ]  dismissed   [ ]  with   [ ]  without prejudice
      [ ]  disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above
      [ ] other state or federal court *(name and address):*

   d. Department:

Page 1 of 3

| Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Legal
Solutions·
Plus | Cal. Rules of Court, rule 3.300 |
|---|---|---|---|

CM-015

| PLAINTIFF/PETITIONER: JAMES SKORHEIM, as Litigation Trustee for the FCH Litigation Trust <br> DEFENDANT/RESPONDENT: SCOTT N. FLANDERS, an individual; et al. | CASE NUMBER: 30-2010 00369301 |
| --- | --- |

2. *(continued)*

  e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

  f.  Filing date:

  g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

  h.  Relationship of this case to the case referenced above *(check all that apply):*

    ☐ involves the same parties and is based on the same or similar claims.

    ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

    ☐ involves claims against, title to, possession of, or damages to the same property.

    ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☐ Additional explanation is attached in attachment 2h

  i.  Status of case:

    ☐ pending

    ☐ dismissed ☐ with ☐ without prejudice

    ☐ disposed of by judgment

3.  a.  Title:

  b.  Case number:

  c.  Court: ☐ same as above

    ☐ other state or federal court *(name and address):*

  d.  Department:

  e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

  f.  Filing date:

  g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

  h.  Relationship of this case to the case referenced above *(check all that apply):*

    ☐ involves the same parties and is based on the same or similar claims.

    ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

    ☐ involves claims against, title to, possession of, or damages to the same property.

    ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☐ Additional explanation is attached in attachment 3h

  i.  Status of case:

    ☐ pending

    ☐ dismissed ☐ with ☐ without prejudice

    ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: May 5, 2010

Daniel J. Callahan, Esq.
    (TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
    (SIGNATURE OF PARTY OR ATTORNEY)

Superior Court of California
County of Orange

**CIVIL COMPLEX CENTER**
**751 W. Santa Ana, Blvd., Santa Ana, CA 92701 (PO BOX 22028 92702-2028)**

| DEPT | CIVIL JUDGES | NOTICED MOTIONS HEARD | EX PARTES HEARD | TELEPHONIC NOTICE TO COURTROOM NO LATER THAN | EX PARTE APPLICATION PRESENTED IN COURTROOM NO LATER THAN |
|---|---|---|---|---|---|
| CX101 | Velasquez (657) 622-5301 | Tuesdays 1:30 P.M. ("Foreclosure" cases only)  Thursdays 1:30 P.M. * | M - F, 1:30 P.M. | Noon, day before ex parte hearing | 10:00 a.m., day of ex parte hearing |
| CX102 | Andler (657) 622-5302 | Thursdays, 1:30 P.M. | M-Th, 9:00 A.M. | 10:00 am, day before ex parte hearing  Ex parte papers shall be lodged directly in dept. CX102 and not filed with the clerk's office unless otherwise ordered by the court. | 12:00 p.m., day before ex parte hearing;  opposition must be in writing |
| CX103 | Bauer (657) 622-5303 | Mondays, 10:30 A.M. | Tu, Th 1:30 P.M. | Noon, day before ex parte hearing | 10:00 a.m., day of ex parte hearing |
| CX104 | Colaw (657) 622-5304 | Fridays 10:00 A.M.* | M, T, W and F, 1:30 P.M. | 12:00 a.m., day before ex parte hearing | 10:00a.m., day of ex parte hearing |
| CX105 | Stock (657) 622-5305 | Fridays, 9:00 A.M. * | M - F, 1:30 P.M. | 10:00 a.m., day before ex parte hearing | 12:00 p.m., day before ex parte hearing;  opposition must be in writing |

*Law and Motion Tentative Rulings are issued and posted on the Internet.

1. The consideration of ex parte applications shall not interfere with or delay the trial in progress. Requirements pursuant to California Rules of Court (CRC) 3.1200-3.1207 shall apply. All paperwork, including proposed pleadings or motions and orders, must be submitted with ex parte application.

   Moving party shall submit on moving papers unless the Court invites oral argument. Moving papers must:

   - Include a declaration of Notice of Ex Parte Hearing and a proposed order.
   - State in first paragraph of the application the irreparable harm that will occur if the relief requested is not granted until after a formally noticed hearing.

2. For information regarding fees or the Orange County Superior Court Local Rules, go to: http://www.occourts.org.

3. Moving and responding parties shall be in the department at the appointed time. No check-ins will be received after the appointed time without good cause. There will be no second call.

4. Teleconference appearances are available through CourtCall, LLC at (310) 914-7884 or (888) 88-COURT. Teleconference appearance is voluntary and does not require consent of the other attorneys or parties in the case. The Court does, however, reserve the right to reject any request.

5. The Complex Litigation Panel requires the filing of a Meet and Confer statement at least 10 calendar days prior to the hearing of any motion, petition or application except discovery motions and Motions to Withdraw as Counsel of Record.

6. The direct Fax filing number is (714) 568-5180. Refer to Orange County Superior Court Local Rule 380. (Not applicable if for complex cases subject to the Electronic Filing Order.)

**PLAINTIFF SHALL SERVE A COPY OF THE COMPLEX GUIDELINES WITH THE SUMMONS AND COMPLAINT.**

Rev Dec 21, 2009

**√ *Plaintiff must serve a copy of these Guidelines with the Summons and Complaint.***



# GUIDELINES

## ALL COMPLEX CIVIL DEPARTMENTS

Welcome to the Complex Civil Litigation Program.  Orange County Superior Court is one of six courts designated by the California Judicial Council as pilot project courts to handle solely complex civil litigation.  These pilot courts were established to apply case management principles to improve the effective administration of justice by reducing the time and expense normally associated with the litigation of complex civil cases.  It has been our experience that these principles make it easier to prepare these cases for trial by providing a more orderly framework for the pre-trial phase of the litigation.

The result is a greater opportunity for early case resolution through mediation and settlement, and improving the way complex cases are tried by encouraging the use of technology.

Counsel's familiarity with the applicable *California Rules of Court ["Local Rules"]*, *Local Rules – Superior Court of California, County of Orange,* and these *Guidelines* is expected.  The *Guidelines* should answer most procedural questions and assist you in feeling comfortable in our courtrooms.

### COURTROOM DEMEANOR, CONDUCT AND ETIQUETTE

Counsel are expected to adhere to the provisions of the *California Attorney Guidelines of Civility and Professionalism*.  (State Bar of the State of California, adopted July 20, 2007, attached to these *Guidelines* as Appendix 1.)

1

## I. GENERAL MATTERS

1. When issued by the court, the provisions of the Case Management Order in the particular action shall govern over these *Guidelines*. Procedural matters not provided for in these *Guidelines* or in a Case Management Order shall be governed by the pertinent provisions of the California statutes, the California Rules of Court, and the California Standards of Judicial Administration. The purpose of these *Guidelines* is to supplement but not contradict the law governing civil procedure.

2. The Superior Court of California, County of Orange has established a system for e-filing in accordance with Code of Civil Procedure §1010.6 and California Rules of Court, rule 2.250 *et seq.* All papers filed in complex civil cases must be electronically filed unless a party has been specifically excused by the Court from the requirement, pursuant to the *Local Rules – Superior Court of California, County of Orange* ("local rules"), rule 308. To register for the program and to obtain additional information, go to: www.occourts.org/complexcivil/ .

3. Cross-complainants must serve a copy of these guidelines and give notice of any scheduled hearings and depositions at the time the cross-complaint is served.

4. Information about filing requirements or fees is available on the court's Internet home page at: http://www.occourts.org, or by telephone at (714) 568-4700. The local rules are available on the court's public internet home page.

5. Telephone appearances are conducted through **CourtCall**, pursuant to the provisions of California Rules of Court, Rule 3.670. Parties are encouraged to seek further information concerning guidelines and protocols from **CourtCall** at (310) 342-0888 or (888) 88-COURT.

## II. Initial Case Management Conference:

The Initial Case Management Conference shall take place in conformance with the requirements set forth in California Rules of Court, rule 3.750. The Initial Case Management Conference is generally scheduled approximately 90 days after the action is filed. Plaintiff is required to give notice of this conference date to all other parties. Thereafter, Status Conferences shall be set in consultation with the Court, according to the needs of the parties.

## III. Case Management Conference and Status Conference Statements:

The judges of the Civil Complex Center have determined that Judicial Council form CM-110, *Civil Case Management Statement* required by California Rules of Court, Rule 3.725(c) for some civil cases, is inadequate to provide the judges the information they need when determining how a particular complex case should be managed. *Form CM-110 should not be used in any action designated or provisionally designated as complex.* Instead, the parties shall file with the court either a Case Management Conference Statement or a Status Conference Statement as described below.

2

**Exhibit A**

Counsel must file an updated Conference Statement for *each* Case Management or Status Conference. The Conference Statement is due no later than 5 court days prior to the hearing.

A Status Conference Statement may be filed as an alternative to the Case Management Conference Statement when appropriate. A Status Conference Statement is generally less detailed than a Case Management Conference Statement and is to be used to advise the court of progress or developments in the case which have occurred since the last review hearing.

A joint statement of the parties is preferred by the court whenever possible.

### IV. CASE MANAGEMENT ORDERS:

Case Management Orders are not required in all cases, but they may be helpful in cases where the sequencing and timing of key events is necessary in the management of the litigation and preparation of the case for trial. However, even if a Case Management Order is not necessary in a particular case, *all complex cases must be managed by counsel, or the court, or both.*

The goal of case management is to bring about a just resolution as speedily and economically as possible. To be effective, case management should be tailored to the needs of the particular litigation and to the resources available; make-work activity should be avoided. The parties or the court should develop and monitor an effective plan for the orderly conduct of pretrial and trial proceedings. A case management plan should prescribe a series of procedural steps, with firm dates, giving direction and order to the case as it progresses through pretrial proceedings to summary disposition or trial. The setting of interim time limits and deadlines is often a necessary part of an effective case management plan.

### V. LAW AND MOTION:

1. **Meet and Confer**: This court adopts the view that pre-filing conferences between counsel may be useful in avoiding useless or unnecessary motions. Therefore, prior to the hearing of any motion, petition or application, except applications to appear *pro hac vice* and motions to withdraw as counsel of record, all counsel and parties appearing in *propria persona* shall confer in a good faith attempt to eliminate the necessity of the hearing or resolve as many disputes as possible.

   Counsel for the moving party shall arrange the conference to meet and confer and, at least 3 calendar days before the hearing, file with the court a statement entitled "Meet and Confer," summarizing the issues remaining in dispute and the respective positions taken.

2. **Tentative Rulings**: Members of the Complex Civil Panel may publish tentative law and motion rulings by any system described in Local Rule 382.

3

Exhibit A

3. **Off Calendars and Continuances:** In order to promote judicial economy and avoid wasting court resources, counsel for moving parties must notify the courtroom clerk as soon as possible if any matter will be taken off calendar. Stipulations between the parties to continue a matter must be approved by the court.

## VI. EX PARTE APPLICATIONS:

1. The court's consideration of an *ex parte* application will not interfere with or delay any trial in progress. The moving party is expected to adhere to the provisions of California Rules of Court, Rule 3.1200 – 3.1207. All papers necessary to the determination of the application, including any proposed pleading, motion or order, must be submitted with the *ex parte* application. Counsel should contact the courtroom clerk to verify any specific deadlines for the submission of moving papers or other preferences applicable to that department. Counsel may also contact the courtroom clerk to inquire if oral argument will be permitted, or if the court will rule based on the application and any written opposition.

2. The application shall include a declaration of Notice of Ex Parte Hearing and a proposed order; and shall state in the notice the irreparable harm, immediate danger or other basis for *ex parte* relief that will result if the requested relief is not granted until a regularly noticed motion may be heard.

## VII. MANDATORY SETTLEMENT CONFERENCES ("MSC's"):

Compliance with Local Rule 316 is required.

All of the judges at the Civil Complex Center are willing to help another judge in the settlement of a complex case depending upon the judge's available calendar. If the parties agree to have a mandatory settlement conference conducted by a judge other than the assigned judge, the parties should first determine the other judge's availability before asking the assigned judge to order the settlement conference. However, it is not presumed that the judge to whom a case is assigned should not conduct the mandatory settlement conferences in his or her cases. If a party objects to the trial judge's participation in the MSC, the party must advise the judge or the courtroom clerk of its objection prior to the setting of the MSC. Counsel are advised to check with the court to determine its preference in this regard.

## VIII. Pre-trial Conferences

1. A Pre-trial Conference may be scheduled 30-90 days before trial for the purpose of determining the readiness of the parties and resolving procedural issues concerning the trial. The goal of the Pre-trial Conference is to make the trial proceed as predictably and smoothly as possible. **The Pre-trial Conference is not a substitute for the Issues Conference required by Local Rule 317.**

Exhibit A

2. At the Pre-trial Conference, counsel should be prepared to state whether his or her client will be using the electronic presentation of evidence at the trial. Using electronic equipment to present evidence at trial requires preparation, organization and cooperation by the parties. The court expects that the parties will work together in devising a protocol for the pre-marking of exhibits by using prefixes or a super-numeration system to designate the proponent of the evidence. Where there are multiple pages to a single exhibit, each page should be bates-stamped. Counsel should contact the courtroom clerk to determine if the trial judge has a specific preference for how exhibits should be marked.

3. In a case where it is reasonable to presume voluminous documents will be produced during discovery, counsel are urged to agree upon a protocol for the pre-marking of exhibits at the earliest time possible, preferably before the initiation of discovery and delivery to a document depository. It is less expensive to mark and index voluminous documents as they are deposited than when it is done on the eve of trial.

4. Counsel are required to cooperate throughout the trial so that one party's electronic exhibits are available to the other side to display during cross-examination.

5. The electronic version of documents, photographs, charts or other demonstrative evidence may be substituted for the actual exhibit at trial upon the stipulation of the parties and order of the court. This guideline is not meant to alter the rules of discovery or the obligation of a party to make available the original of a document for inspection by another party through discovery or at the Issues Conference.

6. Physical exhibits and documents are not required to be presented in a digitalized format. However, evidence which has not been presented in electronic form customarily will be ordered by the court returned at the end of the appeal period to the party which offered it. Before trial commences, counsel will be asked to sign a stipulation for the return and maintenance of the exhibits. Plaintiff will maintain joint exhibits unless the court orders otherwise.

## IX. Use of the Court's Evidence Presentation Systems

1. **On-Site Electronic Evidence Presentation Systems:** Every courtroom has the capability of being equipped with court-based evidence presentation systems for use by the parties. Counsel are strongly encouraged to take advantage of the benefits of the electronic presentation of evidence when in trial at the Civil Complex Center to enhance the orderly and effective presentation of evidence, reduce concerns about the custody and security of exhibits, and reduce the work and expense associated with the tagging, storing and transporting of exhibits. In an appropriate case, the court may require the use of an electronic evidence presentation system. Electronic evidence presentation systems must be compatible with the court's infrastructure (video distribution amplifier, wiring, conduit, floor receptacles and connectors).

5

Exhibit A

2. **Electronic Evidence Standard Format:** Counsel presenting evidence that is exclusively electronic in form must present the evidence in PDF file format and stored on CD-R. Whenever evidence is presented electronically, the physical custody of exhibits by the clerk is replaced by the electronic record of the exhibits. Evidence must be in sequential order with the exception of JPEG and MPEG files which shall be stored on separate discs. Counsel may also prepare electronic evidence using alternate non-proprietary formats subject to the approval of the court. The compact discs (CDs) must be labeled as follows:

Case #
Case Name
Exhibits _____ to _____
(Original or Backup copy)

The courtroom clerk will maintain an updated exhibit list. When evidence is electronically presented at the trial, the court may require counsel to periodically submit to the clerk an up-to-date CD containing exhibits received into evidence.

It is counsels' responsibility to identify and track redactions, modifications, and substitution of exhibits. Counsel are expected to be prepared to submit an up-to-date evidence CD with all redactions, modifications, and substitutions, as well as impeachment documents used, upon the courtroom clerk's request.

Impeachment exhibits are not pre-marked. However, counsel are responsible for having the document electronically recorded upon being offered into evidence (exhibit numbers may be reserved for this purpose).

If the jury will be provided the evidence in electronic format for its deliberation, the parties are required to meet and confer and submit the final joint exhibit list containing only those exhibits received into evidence. The CD used by the jurors must include the joint exhibit list and the electronically stored exhibits which have been entered into evidence. Submission of the joint evidence CD also serves as a stipulation that all exhibits presented in electronic form to the jury are complete and correct. Any disagreement must be brought to the attention of the court at the earliest reasonable time. Counsel must lodge two (2) evidence CDs of all exhibits received into evidence.

## X. TRIALS – MOTIONS IN LIMINE

Counsel should attempt to resolve evidentiary disputes at the Local Rule 317 Issues Conference before resorting to filing a motion *in limine*. It is frequently more productive of court time, and the client's money for counsel to informally address at the Issues Conference the issues which could be raised in motions *in limine* and, instead of a motion, present a stipulation to the court on uncontested issues. Matters of day-to-day trial logistics and common professional courtesy should not be the subject of motions *in limine*. These are matters of common professional courtesy that should be accorded counsel in all trials. See, Kelly v. New West Federal Savings (1996) 49 Cal.App.4[th] 659,671.

6

APPENDIX 1
## California Attorney Guidelines of Civility and Professionalism
(Abbreviated, adopted July 20, 2007)

INTRODUCTION. As officers of the court with responsibilities to the administration of justice, attorneys have an obligation to be professional with clients, other parties and counsel, the courts and the public. This obligation includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution.

These are guidelines for civility. The Guidelines are offered because civility in the practice of Law promotes both the effectiveness and the enjoyment of the practice and economical client representation. The legal profession must strive for the highest standards of attorney behavior to elevate and enhance our service to justice. Uncivil or unprofessional conduct not only disserves the individual involved, it demeans the profession as a whole and our system of justice.

These voluntary Guidelines foster a level of civility and professionalism that exceed the minimum requirements of the mandated Rules of Professional Conduct as the best practices of civility in the practice of law in California. The Guidelines are not intended to supplant these or any other rules or laws that govern attorney conduct. Since the Guidelines are not mandatory rules of professional conduct, nor rules of practice, nor standards of care, they are not to be used as an independent basis for disciplinary charges by the State Bar or claims of professional negligence.

The Guidelines are intended to complement codes of professionalism adopted by bar associations in California. Individual attorneys are encouraged to make these guidelines their personal standards by taking the pledge that appears at the end. The Guidelines can be applicable to all lawyers regardless of practice area. Attorneys are encouraged to comply with both the spirit and letter of these guidelines, recognizing that complying with these guidelines does not in any way denigrate the attorney's duty of zealous representation.

SECTION 1. The dignity, decorum and courtesy that have traditionally characterized the courts and legal profession of civilized nations are not empty formalities. They are essential to an atmosphere that promotes justice and to an attorney's responsibility for the fair and impartial administration of justice.

SECTION 2. An attorney should be mindful that, as individual circumstances permit, the goals of the profession include improving the administration of justice and contributing time to persons and organizations that cannot afford legal assistance.

An attorney should encourage new members of the bar to adopt these guidelines of civility and professionalism and mentor them in applying the guidelines.

SECTION 3. An attorney should treat clients with courtesy and respect, and represent them in a civil and professional manner. An attorney should advise current and potential clients that it is not acceptable for an attorney to engage in abusive behavior or other conduct unbecoming a member of the bar and an officer of the court.

As an officer of the court, an attorney should not allow clients to prevail upon the attorney to engage in uncivil behavior.

An attorney should not compromise the guidelines of civility and professionalism to achieve an advantage.

SECTION 4. An attorney's communications about the legal system should at all times reflect civility, professional integrity, personal dignity, and respect for the legal system. An attorney should not engage in conduct that is unbecoming a member of the Bar and an officer of the court.

Nothing above shall be construed as discouraging the reporting of conduct that fails to comply with the Rules of Professional Conduct.

SECTION 5. An attorney should be punctual in appearing at trials, hearings, meetings, depositions and other scheduled appearances.

SECTION 6. An attorney should advise clients that civility and courtesy in scheduling meetings, hearings and discovery are expected as professional conduct.

In considering requests for an extension of time, an attorney should consider the client's interests and need to promptly resolve matters, the schedules and willingness of others to grant reciprocal extensions, the time needed for a task, and other relevant factors.

Consistent with existing law and court orders, an attorney should agree to reasonable requests for extensions of time that are not adverse to a client's interests.

SECTION 7. The timing and manner of service of papers should not be used to the disadvantage of the party receiving the papers.

SECTION 8. Written materials directed to counsel, third parties or a court should be factual and concise and focused on the issue to be decided.

7

Exhibit A

SECTION 9. Attorneys are encouraged to meet and confer early in order to explore voluntary disclosure, which includes identification of issues, identification of persons with knowledge of such issues, and exchange of documents.

Attorneys are encouraged to propound and respond to formal discovery in a manner designed to fully implement the purposes of the California Discovery Act.

An attorney should not use discovery to harass an opposing counsel, parties or witnesses. An attorney should not use discovery to delay the resolution of a dispute.

SECTION 10. An attorney should consider whether, before filing or pursuing a motion, to contact opposing counsel to attempt to informally resolve or limit the dispute.

SECTION 11. It is important to promote high regard for the profession and the legal system among those who are neither attorneys nor litigants. An attorney's conduct in dealings with nonparty witnesses should exhibit the highest standards of civility.

SECTION 12. In a social setting or otherwise, an attorney should not communicate ex parte with a judicial officer on the substance of a case pending before the court, unless permitted by law.

SECTION 13. An attorney should raise and explore with the client and, if the client consents, with opposing counsel, the possibility of settlement and alternative dispute resolution in every case as soon possible and, when appropriate, during the course of litigation.

SECTION 14. To promote a positive image of the profession, an attorney should always act respectfully and with dignity in court and assist the court in proper handling of a case.

SECTION 15. An attorney should not take the default of an opposing party known to be represented by counsel without giving the party advance warning.

SECTION 16. An attorney should avoid even the appearance of bias by notifying opposing counselor an unrepresented opposing party of any close, personal relationships between the attorney and a judicial officer, arbitrator, mediator or court-appointed expert and allowing a reasonable opportunity to object.

SECTION 17. An attorney should respect the privacy rights of parties and non-parties.

SECTION 18. An attorney should negotiate and conclude written agreements in a cooperative manner and with informed authority of the client.

In addition to other applicable Sections of these Guidelines, attorneys engaged in a transactional practice have unique responsibilities because much of the practice is conducted without judicial supervision.

SECTION 19. In addition to other applicable Sections of these Guidelines, in family law proceedings an attorney should seek to reduce emotional tension and trauma and encourage the parties and attorneys to interact in a cooperative atmosphere, and keep the best interests of the children in mind.

SECTION 20. In addition to other applicable Sections of these Guidelines, criminal law practitioners have unique responsibilities. Prosecutors are charged with seeking justice, while defenders must zealously represent their clients even in the face of seemingly overwhelming evidence of guilt. In practicing criminal law, an attorney should appreciate these roles.

SECTION 21. Judges are encouraged to become familiar with these Guidelines and to support and promote them where appropriate in court proceedings.

---

ATTORNEY'S PLEDGE. I commit to these Guidelines of Civility and Professionalism and will be guided by a sense of integrity, cooperation and fair play.

I will abstain from rude, disruptive, disrespectful, and abusive behavior, and will act with dignity, decency, courtesy, and candor with opposing counsel, the courts and the public.

As part of my responsibility for the fair administration of justice, I will inform my clients of this commitment and, in an effort to help promote the responsible practice of law, I will encourage other attorneys to observe these Guidelines.

(Rev. July 1, 2009)

**Exhibit A**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ORANGE**

**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**INFORMATION PACKAGE**

**NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):**

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its Web site as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ORANGE

### ADR Information

**Introduction.**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

**BENEFITS OF ADR.**

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.**  A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.**  When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.**  In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.**  ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.**  In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.**  Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

**DISADVANTAGES OF ADR.**

ADR may not be suitable for every dispute.

**Loss of protections.**  If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

**Less discovery.**  There generally is less opportunity to find out about the other side's case with ADR than with litigation.   ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.**  The neutral may charge a fee for his or her services.  If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays if the dispute is not resolved.**  Lawsuits must be brought within specified periods of time, known as statues of limitation.  Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.**  In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

**Cases for Which Arbitration May Be Appropriate.**  Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May <u>Not</u> Be Appropriate.**  If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.**  In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

**Cases for Which Mediation May Be Appropriate.**  Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May <u>Not</u> Be Appropriate.**  Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.**  In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.**   Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate.**   Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.**  Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

## ADDITIONAL INFORMATION.

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types.  The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the Yellow Pages under "Arbitrators" or "Mediators"

Free mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA) For information regarding DRPA, contact:
- Institute for Conflict Management (714) 288-5600
- Community Service Programs, Inc. (949) 851-3168
- Orange County Human Relations (714) 834-7198
- Fair Housing Council of Orange County (714) 569-0827

For information on the Superior Court of California, County of Orange court ordered arbitration program, call (714) 834-3774 or refer to Local Rules 360 and 446.

The Orange County Superior Court is offering pilot programs for Civil Mediation and Early Neutral Evaluation (ENE) for civil cases filed at the Central Justice Center.  For the Civil Mediation pilot program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session.  For the ENE  program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session.  Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) pilot programs is available on the Court's website at www.occourts.org, or by calling (714) 834-5309.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*: | *FOR COURT USE ONLY* |
|---|---|
| Telephone No.:                    Fax No. (Optional):<br>E-Mail Address (Optional):<br>ATTORNEY FOR *(Name)*:                    Bar No: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☒ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500
☐ West – 8141 13ᵗʰ Street, Westminster, CA 92683-0500

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |
|---|---|

Plaintiff(s)/Petitioner(s), _____

_____

and defendant(s)/respondent(s), _____

_____

agree to the following dispute resolution process:

☐  Mediation

☐  Arbitration (must specify code)
  ☐ Under section 1141.11 of the Code of Civil Procedure
  ☐ Under section 1280 of the Code of Civil Procedure

☐  Neutral Case Evaluation

☐  Other (specify): _____

The ADR process must be completed no later than 90 days after the date of this Stipulation.

☐  Plaintiff(s)/Petitioner(s) and defendant(s)/respondent(s) further agree as follows:

  _____

☐  The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals.  We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court rule 3.720 et seq.

Date: _____     _____     _____
                          (SIGNATURE OF PLAINTIFF OR ATTORNEY)     (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: _____     _____     _____
                          (SIGNATURE OF DEFENDANT OR ATTORNEY)     (SIGNATURE OF DEFENDANT OR ATTORNEY)

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

Approved for Optional Use                                        California Rules of Court, rule 3.221
L1270 (Rev February, 2008)

# PROOF OF SERVICE

**STATE OF CALIFORNIA** )
                       ) ss
**COUNTY OF LOS** )
**ANGELES** )

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 2029 Century Park East, Suite 1370, Los Angeles, California 90067.  On June 7, 2010, I served the following documents:

## NOTICE OF REMOVAL OF ACTION
## PURSUANT TO 28 U.S.C. §§ 1441 AND 1452(a)

| | |
|---|---|
| ☒ | By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below. |
| | Daniel J. Callahan<br>Brian J. McCormack<br>David J. Darnell<br>CALLAHAN & BLAINE, APLC<br>3 Hutton Centre Drive, Ninth Floor<br>Santa Ana, CA 92707<br>Phone:  714-241-4444<br>Fax:  714-241-4445<br>*Attorneys for Plaintiff JAMES SKORHEM,*<br>*as Litigation Trustee for the FCH Litigation Trust* |

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on June 7, 2010, at Los Angeles, California.

*Diane Endo*
_____
DIANE ENDO

4936586v.3

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV10- 789 AG (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ]  **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X]  **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ]  **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
JAMES SKORHEIM, as Litigation Trustee for the FCH
Litigation Trust

**DEFENDANTS**
Scott N. Flanders, Thomas W. Bassett, William F. Baker, Raymond C.H. Bryan, Robin J. Hardie, Burl Osborne, David M. Tolley, Michael J. Dominguez, Mark J. Masiello, David D. Threshie, Mark T. Gallogly, Jill A. Greenthal, James J. Spanfeller, Chris Philibbosian, Gregory J. Wallace

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
CALLAHAN & BLAINE, APLC
Daniel J. Callahan; Brian J. McCormack; David J. Darnell
3 Hutton Centre Drive, Ninth Floor
Santa Ana, CA 92707; Phone: 714-241-4444

Attorneys (If Known)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
Harvey I. Saferstein; Nada I. Shamonki
2029 Century Park East, Suite 1370
Los Angeles, California 90067; Phone: 310.586.3200

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** Exceeds $75,000

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Removal of causes of action arising under 11 USC §§ 544, 547 & 550 (preference and fraudulent conveyance claims)  pursuant to 28 USC §§ 1441 (federal question) and 1452(a) (claims related to bankruptcy case) .

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **IMMIGRATION** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**SACV10-789 AG (MLGx)**

FOR OFFICE USE ONLY:   Case Number:

American LegalNet, Inc.
www.FormsWorkflow.com

BY FAX

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange-Flanders & Threshie | MO-Bassett; CT-Baker; NY-Bryan; CO-Hardie; TX-Osborne; NY-Tolley, Gallogly & Spanfeller; RI-Domnguez & Masiello; MA-Greenthal; San Diego-Philibbosian; WY-Wallace |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| The claims alleged in the complaint occurred in multiple jurisdictions throughout the United States, including, among others, Orange County and Delaware | The claims alleged in the complaint occurred in multiple jurisdictions throughout the United States, including, among others, Orange County and Delaware |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Nada Shamonki_   Date June 7, 2010

Nada I. Shamonki

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com