# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SKORHEIM, as Litigation Trustee for the FCH Litigation Trust,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT FLANDERS, et al.,<br><br>Defendants. | CASE NO. SACV 10-0789 AG (MLGx)<br><br>**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS** |

Plaintiff James Skorheim ("Plaintiff"), as litigation trustee for the FCH Litigation Trust, filed a complaint ("Complaint") against Scott Flanders and multiple other former directors of Freedom Communications ("Defendants"). Defendants filed a Motion To Dismiss ("Motion") under Federal Rule of Civil Procedure 12(b)(6). After reviewing all papers and arguments submitted, the Court DENIES in part and GRANTS in part the Motion.

**BACKGROUND**

The following facts are taken from the Plaintiff's Complaint ("Complaint") and as it must for this Motion, the Court assumes them to be true.

Freedom Communications Holdings, Inc. with Freedom Communications, Inc. (together, "the Company") was a privately held media company that owned a variety of daily and weekly newspapers, magazines, specialty publications, and television stations. (Compl. ¶¶ 18, 42.) Defendants all held positions as directors of the Company at various times. (*Id.* ¶ 16.) The board of directors generally had 13 seats. (*Id.* ¶ 16.)

The trouble began in 2004 when certain members of the Hoiles family, who at that time wholly owned the Company, wanted to cash out their holdings. (*Id.* ¶ 3.) Certain family members wanted to liquidate their ownership interests, while others opposed an outright sale of the Company to a third party. (*Id.* ¶ 44.) As a resolution, the Company entered into a transaction (the "2004 Cash Out"), which sold 40% of the Company stock to The Blackstone Group ("Blackstone") and Providence Equity Partners ("Providence") and added $900 million in new debt. (*Id.* ¶ 3.) The Company's new debt was acquired through a Credit Agreement with JPMorgan Chase ("JPMorgan") as administrative agent for the lenders. (*Id.* ¶ 45.) The 2004 Cash Out "severely impaired the Company's balance sheet." (*Id.* ¶ 49.) At the conclusion of the 2004 Cash Out, only $20 million remained available for the Company. (*Id.* ¶ 46.) And as part of the 2004 Cash Out, "more than $1 billion went directly to the Cashed Out Family Members, [Blackstone and Providence], JPMorgan, and other financial advisors." (*Id.*) The majority of the 2004 Cash Out "was funded by saddling the Company with hundreds of millions of dollars of secured debt, for which the Company received little to no value in return." (*Id.* ¶ 47.)

The 2004 Cash Out increased the Company's "funded debt" from "less than $350 million" to "approximately $900 million." (*Id.* ¶ 49.) The Company was so highly leveraged from this transaction that it was rendered insolvent in 2004. (*Id.* ¶ 50.) The Company's equity holders, including certain Hoiles family members, Blackstone, and Providence, were therefore

"out of the money." (*Id.* ¶ 51.) After the 2004 Cash Out, the Company never regained solvency. (*Id.* ¶ 52.)

Certain Directors continued to "act in blind devotion to the equity holders' interests and engaged in self-dealing by both siphoning cash out of the Company, both in the form of dividend payments to shareholders and monitoring fees [to Blackstone and Providence], and improperly using the Company's assets as a bargaining chip with the [lenders] in an attempt to create value for insiders and out of the money equity positions at the expense of unsecured creditors." (*Id.* ¶ 54.) The independent Directors did nothing to prevent such acts. (*Id.*) The Company continued to pay out dividends through the second quarter of 2008. (*Id.*, ¶¶ 55-65, 68.) Even after it ceased paying dividends, the Company still paid "'monitoring' fees" to Blackstone and Providence. (*Id.* ¶ 70.)

By early 2008, the Company faced significant risk of defaulting on its covenants under the Credit Agreement. (*Id.* ¶ 67.) But the Directors "never considered filing a chapter 11 bankruptcy" at that time. (*Id.*) By the summer of 2008, the Directors recognized that a covenant default was imminent at the end of the third quarter on September 30, 2008. (*Id.* ¶ 68.) Indeed, in September 2008, the Company defaulted on its covenants under the Credit Agreement. (*Id.* ¶ 70.) "Recognizing that the Company's liability far exceed its assets and filing for bankruptcy protection would eliminate any recovery for equity, the Directors began to strategize alternative ways by which out of the money shareholders could recover some value." (*Id.*)

From November 2008 through April 2009, the Directors, "ever motivated by the sole objective of extracting value for equity," engaged the lenders in discussions about a temporary waiver of any covenant defaults. (*Id.* ¶ 74.) The Company also engaged Houlihan Lokey ("Houlihan") as a financial advisor in March 2009. (*Id.* ¶ 75.) Houlihan strongly recommended that the Directors pursue a comprehensive restructuring rather than a waiver. (*Id.*) Despite this advice, the Directors entered into a Waiver Agreement in April 2009 with JPMorgan and the lenders. (*Id.* ¶ 81.) The Waiver Agreement was high-risk and would only work out if there was a combination of a general market recovery, a more favorable valuation environment for media companies, and luck. (*Id.* ¶¶ 78-79.) To obtain the waiver, the Company's management, as

3

authorized by Directors, "granted JPMorgan 'whatever fee that the banks wanted.'" (*Id.* ¶ 86.) Plaintiff alleges that "the Company and its creditors, as the Company's beneficial owners, gained nothing from the Waiver." (*Id.* ¶ 84.)

In June 2009, Houlihan advised the Company on the timing of a chapter 11 bankruptcy. (*Id.* ¶ 90.) Based on projections, the best case scenario concerning recovery for the unsecured creditors would occur if the Company began its Chapter 11 cases before the preference period for the Waiver Agreement expired. (*Id.* ¶ 91.) By starting Chapter 11 proceedings before the preference period expiration, the Directors could preserve assets and maintain the value of the Company. (*Id.* ¶ 92.) But instead, the Directors proposed Chapter 11 restructuring terms to the Lenders that provided for bankruptcy filing after the preference period expired. (*Id.* ¶ 93.)

In August 2009, the Directors and the lenders agreed to Chapter 11 restructuring terms. (*Id.* ¶ 96.) The terms included filing for bankruptcy on September 1, 2009, after the expiration of the preference period. (*Id.*) The restructuring terms were incorporated into an agreement ("Plan Support Agreement") between the Company and the Lenders. (*Id.* ¶ 97.) The agreement included a "death trap" clause, which provided that if the general unsecured creditors rejected the proposed plan, they would receive nothing. (*Id.* ¶ 98.) The Plan Support Agreement did not require payment of fees to JPMorgan in connection with the Company's restructuring. (*Id.* ¶ 98.) But the Company still chose to pay JPMorgan a $3 million fee. (*Id.* ¶ 99.)

In September 2009, the Company and related debtors filed voluntary petitions under Chapter 11 of Title 11 of the United States Code. (*Id.* ¶ 17.) As part of the Joint Plan of Reorganization under Chapter 11 (the "Plan"), the FCH Litigation Trust was created, with Plaintiff as the court-approved Litigation Trustee. (*Id.* ¶ 10.) On the effective date of the Plan, the debtors transferred to the Litigation Trust their right, title, and interest in the claims as well as their causes of action as asserted in the Complaint. (*Id.* ¶ 11.) The FCH Litigation Trust was created to "investigate and prosecute potential causes of action for the benefit of the Company's general unsecured creditors." (*Id.* ¶ 11.)

Plaintiff alleges fifteen claims in his Complaint against various subsets of Defendants, numbered and described in the Complaint as follows: (1) "Illegal Dividend and Unlawful

4

Distribution – 2004 Dividend Payments"; (2) "Illegal Dividend and Unlawful Distribution – 2005 Dividend Payments"; (3) "Illegal Dividend and Unlawful Distribution – 2006 Dividend Payments"; (4) "Breach of Fiduciary Duty – 2006 Dividend Payments"; (5) "Illegal Dividend and Unlawful Distribution – 2007 Dividend Payments"; (6) "Negligence – 2006 Dividend Payments"; (7) "Breach of Fiduciary Duty – 2007 Dividend Payments"; (8) "Negligence – 2007 Dividend Payments"; (9) "Illegal Dividend and Unlawful Distribution – 2008 Dividend Payments"; (10) "Breach of Fiduciary Duty – 2008 Dividend Payments"; (11) "Negligence – 2008 Dividend Payments"; (12) "Breach of Fiduciary Duty – Failure to Preserve the Company's Fraudulent Transfer Causes of Action"; (13) "Breach of Fiduciary Duty – the Waiver Agreement"; (14) "Breach of Fiduciary Duty – Failure to Preserve the Company's Preferential Transfer Causes of Action"; and (15) "Breach of Fiduciary Duty – Payment of $3 Million to JPMorgan."

Defendants now move to dismiss the following claims: Claims 4, 6, 7, and 8 on statute of limitations grounds, Claims 12 on statute of limitations grounds and for failure to state an actionable breach of the duty of loyalty, Claims 13 and 14 for failure to state an actionable breach of the duty of loyalty, and Claim 15 for failure to state a claim for waste.

**LEGAL STANDARD**

A court should dismiss a complaint when its allegations fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Pollard v. Geo Group, Inc.*, 607 F.3d 583, 585 n.3 (9th Cir. 2010); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).

Last week, the Ninth Circuit reviewed the standard of Federal Rule of Civil Procedure 12(b)(6) and stated that a complaint must be (1) "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it," and (2) "sufficiently plausible that it is not unfair to require the opposing party to be subjected to the expense of discovery." *Starr v. Baca*, No. 09-55233, slip. op. 2251, 2276 (9th Cir. Feb. 11, 2011).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1940 (citing *Twombly*, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," *id.*, or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

## ANALYSIS

**1.    FIDUCIARY DUTY TO WHOM?**

Defendant argues that Plaintiff impermissibly relies on the notion of a fiduciary duty owed to creditors. The argument pops up throughout Defendants' papers, but seems directed as Claims 12, 13, and 14. Since the argument is a recurring theme, the Court addresses it first.

Defendants argue that "[t]his theory of the case is premised upon a flawed interpretation of Delaware law, because 1) directors do not owe direct fiduciary duties to creditors . . . ." (Motion at 11:4-6.) Defendants point out authority stating that "[t]he law is thus settled that directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of creditors' interests." *Off'l Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat. Amusements, Inc. (In re Midway Games)*, 428 B.R. 303, 316

1  (Bankr. D. Del. 2010). Further, Defendants cite a recent holding of the Delaware Supreme Court
2  that a plaintiff "fails to state a claim, as a matter of Delaware law, to the extent that it attempts to
3  assert a direct claim for breach of fiduciary duty to a creditor while [the company] was operating
4  in the zone of insolvency." *North American Catholic Educ. Programming Found., Inc., v.*
5  *Gheewalla*, 930 A.2d 92, 101 (Del. 2007).

6  Plaintiff argues that Defendants misconstrue its allegations about to whom a direct
7  fiduciary duty is owed during insolvency. Plaintiff agrees with Defendants and settled law that,
8  when a corporation is solvent, a director owes a duty to act in the best interests of a corporation.
9  And Plaintiff notes that "[w]hen a corporation is solvent (where much of the case law arises
10 from), these interests generally coincide with the interests of shareholders." (Opposition at 6:27-
11 7:1.) But, Plaintiff argues, the analysis changes when the corporation becomes insolvent.
12 "When a corporation is insolvent, however, [its] interests generally coincide with the interests of
13 creditors." *Id*. Creditors take the place of shareholders as "residual beneficiaries" during
14 insolvency. *Gheewalla*, 930 A.2d at 101. "Consequently, the creditors of an insolvent
15 corporation have standing to maintain derivative claims against directors on behalf of the
16 corporation for breaches of fiduciary duties." *Id*. Plaintiff points out that Defendants' counsel
17 published an article stating the same thing. (Opp'n at 9:5-12, citing Bankruptcy, Restructuring
18 and Commercial Law Advisory: Fiduciary Duties and Insolvency: Limiting Personal Liability in
19 Tough Economic Times (Mintz Levin, Cohn, Ferris, Glovsky and Popeo, P.C., May 11, 2009)).

20 Plaintiff sometimes alleges in the Complaint that a duty was owed to the creditors in a
21 way that could sound like an alleged direct duty to creditors. But the Complaint overall and the
22 Opposition to the Motion to Dismiss serve to clarify that any duty to the creditors is not a direct
23 duty, but rather a duty owed through the directors' duties to the corporation. For example,
24 Plaintiff alleges that the Directors "had a duty to act in the best interests of the Company and to
25 preserve its assets for the benefit of its creditors" (Compl. ¶ 228) or "[b]ecause the Company
26 was insolvent immediately upon the closing of the 2004 Cash Out transaction, the . . . Directors
27 also owed fiduciary duty for the benefit of the Company's creditors" (*Id*., ¶ 128).

28

The authority cited by Defendants supports Plaintiff's position that directors of an insolvent corporation owe a fiduciary duty to the corporation and that creditors become the residual beneficiaries in place of the shareholders. *See Gheewalla*, 930 A.2d at 101. The fact that the creditors become the residual beneficiaries of an insolvent corporation does not mean that they become the recipients of a direct fiduciary duty. Nor do Plaintiff's claim depend on a direct fiduciary duty. As discussed, current Delaware law governing fiduciary duties in insolvency does not bar Plaintiff's Claim 12, 13, and 14.

Thus, the Court will now turn to Defendants' other arguments about Plaintiff's claims, starting with Claims 4, 6, 7, and 8, and then returning to Claims 12, 13, 14, and finally turning to Claim 15.

**2. CLAIMS 4, 6, 7, AND 8**

Defendants move to dismiss Claims 4, 6, 7, and 8 on statute of limitations grounds, as the Court previously stated. Those claims allege that certain Directors breached their fiduciary duties and acted negligently by authorizing dividends in 2006 and 2007. Defendants argue that these claims are all time-barred because the Delaware statute of limitations for breach of fiduciary duty and negligence claims is three years. The Complaint was filed on May 5, 2010, so Defendants argue that any claims based on authorization of dividends before May 5, 2007 are time-barred. (Motion at 8:2-17.) Defendants argue that Claims 4 and 6, which assert fiduciary duty and negligence claims based on dividends from 2006, are time-barred in their entirety. And they argue that Claims 7 and 8, which assert the same two claims based on dividends from 2007, are time-barred for dividends from before May 5, 2007.

Plaintiff argues in his Opposition that he is entitled to a two-year extension under 11 U.S.C. § 108(a), which states that if applicable non-bankruptcy law fixes a period in which a debtor may commence an action, and the period has not expired before the date of the filing of the bankruptcy petition, the bankruptcy trustee has an additional two years to file the claim. Under Plaintiff's application of § 108(a), the Trustee would have two years from the petition

date in September 2009 to file such claims, and the May 2010 complaint would therefore be timely as to Claims 4, 6, 7, and 8.

Defendants counter in their Reply that § 108(a) only applies to bankruptcy trustees and debtors-in-possession, not a litigation trustee like the Plaintiff. They argue that while the statute specifically limits its applicability to claims of bankruptcy trustees, courts have been careful only to extend it to debtors-in-possession but not other fiduciaries of the estate, particularly post-confirmation.

Defendants rely on *U.S. for Use of Am. Bank v. C.I.T. Const. Inc. of Texas*, 944 F.2d 253 (5th Cir. 1991) for the argument that the trustee Plaintiff here is not protected by § 108(a). But in *American Bank*, the court found that § 108(a) was unavailable to the plaintiff, a single creditor, who was attempting "solely to advantage itself, not to benefit all of Elders's creditors." *Id*. at 260. The trouble with granting the "limitational lifesaving device" to plaintiff there was that American was the only party who would benefit from its claim. The reason why § 108(a) applies to debtors-in-possession but not debtors themselves is that "the protections of § 108(a) cease to exist only when 'any recovery by [the debtor] . . . would vest solely in [the debtor].'" *Id.* at 260. The logical conclusion is that § 108(a) applies when the benefit of the claim accrues to multiple creditors rather than to a single party. Here, the Trustee is seeking recovery for a certain group of creditors, namely the unsecured creditors, so the benefit will go to many parties instead of a single plaintiff. Thus, the Court does not find the logic of *American Bank* to be applicable here.

But Defendants further argue that § 108(a) also doesn't apply unless recovery accrues to all creditors, and here, only a certain group of creditors, namely the unsecured creditors, would benefit from the recovery. Defendants cite *Natco Indus., Inc. v. Federal Ins. Co.*, 69 B.R. 418, 419 (S.D.N.Y. 1987), which distinguishes between the "trustee and debtor in possession on the one hand, and the debtor on the other," because "like a trustee, a debtor in possession has fiduciary obligations to *all the creditors* of the bankrupt" (emphasis added). From the surrounding context, however, it is doubtful that the word "all" is entitled to as much emphasis as Defendants would contend. Even in *Natco*, the distinction is still between a party seeking to

9

1  benefit a group of creditors as opposed to a debtor seeking to benefit only itself, as the *Natco*
2  court notes that "[other] courts have held that debtors acting in their own interests, such as
3  plaintiffs, could not invoke section 108." *Id.*  Thus, the distinction seems to be between a
4  plaintiff acting solely for its self-interest on one hand and a plaintiff acting to benefit others on
5  the other.  The *Natco* and *American Bank* courts do not seem to have contemplated whether "all
6  creditors" should be distinguished from "some creditors," but rather focus on whether a single
7  party seeking recovery to itself can invoke § 108(a).  Here, the Trustee is acting for the
8  Litigation Trust, which was "created . . . for the benefit of the Company's general unsecured
9  creditors."  (Compl., ¶ 11.)  Defendants do not argue, nor could they, that the Trustee is acting
10 for his own self-interest.

11       Defendants launch one final argument against the availability of § 108(a) here.  They
12 argue that the trustee Plaintiff here is an assignee of the claims to be extended under § 108(a),
13 and that an assignee is not entitled to the protection of that statute.  Defendants cite *Motor*
14 *Carrier Audit and Collection, Co. v. Lighting Prods., Inc.* ("*MCA*"), 113 B.R. 424 (N.D. Ill.
15 1989) to support this contention.  MCA states that "it would be inconsistent with the plain
16 language of the Bankruptcy Code, to allow a mere purchaser or assignee of a Chapter 7 debtor's
17 claims to take advantage of § 108." *Id.* at 426.  But this logic seems to follow the same
18 reasoning as *Natco* and *American Bank*, in that a single party – here, the assignee – cannot claim
19 the protection of § 108(a) because that protection is properly reserved for a party serving the
20 interests of others, such as a debtor-in-possession or a trustee.

21       Because these claims were timely at the time of the voluntary petition and Plaintiff filed
22 the Complaint within two years after the petition date, Plaintiff timely asserts them here.
23 Defendant's Motion to dismiss Claims 4, 6, 7, and 8 is DENIED.

25 **3.     CLAIM 12**

27       Claim 12 is for breach of fiduciary duty due to the failure to preserve the Company's
28 fraudulent transfer causes of action.  Defendants move to dismiss Claim 12 on several grounds.

10

1  The Court first addresses Defendants' statute of limitations argument, then turns to Defendants'
2  other arguments.

### 3.1   Statute of Limitations

Defendants' first argument is that this claim is time-barred because the underlying fraudulent transfer claim has a four-year statute of limitations that expired in May 2008. Defendants argue that Claim 12 is an "attempt[] to circumvent" the statute of limitations on the fraudulent transfer action. (Motion at 14:27.) But Plaintiff argues that he is not trying to resurrect the underlying fraudulent transfer claim. Rather, Plaintiff argues, the breach was the failure to preserve, which occurred in 2008 when the fraudulent transfer claim expired.

To support their argument, Defendants cite *Bren v. Capital Realty Grp. Senior Hous., Inc.*, No. Civ. A. 19902-NC, 2004 WL 370214 (Del. Ch. Feb. 27, 2004). In *Bren*, a creditor of an insolvent limited partnership brought a claim, among others, for breach of fiduciary duty. The defendant in *Bren*, like Defendants here, argued that such a claim was barred by the statute of limitations.

The *Bren* court held that "[w]hen considered in light of the facts pled in the Complaint, the wrong to the Partnership, and thus the Noteholders, occurred on September 30, 1998 – when the General Partner sold four Partnership properties" and that the Court "looks to the actual nature of the purported wrong according to the facts alleged and is not bound by the plaintiff's theory of the alleged wrong." *Id*.  As a court of equity, the Delaware Chancery court "is not bound by the legal statute of limitations," but found no reason to deviate from it in *Bren*. *Id*. at *5.

Plaintiff briefly addresses *Bren* in its Opposition. Plaintiff argues that the *Bren* defendant was the same at the time of both the alleged fraudulent transfer and the alleged breach of duty. Because here, the alleged breach was by the 2008 board of directors and not by the 2004 board of directors, Plaintiff argues that the cause of action could not accrue until 2008. Although not directly argued by Plaintiff, it is also true that the fiduciary duty claim would not be viable until

11

1   the underlying fraudulent transfer claim had expired.  The breach would only occur after the
2   underlying claim expired.  Plaintiff offers some case law supporting the idea that "the limitation
3   period on claims against a fiduciary for failure to preserve a cause of action runs consecutively,
4   not concurrently, with the limitations period on the cause of action the fiduciary allowed to
5   expire."  (Opp'n at 34:25-27.)  For example, in *In re Smith*, a bankruptcy court, applying New
6   York statutes of limitations, noted that the statutes of limitations run consecutively when
7   bringing a claim for a breach of fiduciary duty for failure to bring a malpractice claim.  *In re*
8   *Smith*, 426 B.R. 435, 441 (E.D.N.Y. 2010) ("The Trustee's former counsel was terminated in
9   1999.  Under New York law, the statute of limitations for the alleged malpractice claim began to
10  run in 1999 and thus ended in 2002. Therefore, the limitations period on any claim against the
11  Trustee for failing to bring a malpractice claim began to run in 2002 and ended in 2005.")
12         This language from *In re Smith* is dicta and perhaps not a carefully measured comment,
13  so the primary focus remains on *Bren.*  In *Bren*, as stated previously, the primary basis for the
14  court's denial of the plaintiff's breach of fiduciary duty claim was that it "look[ed] to the actual
15  nature of the purported wrong." *Bren*, at *4.  Under this logic, the Court must now determine
16  whether Plaintiff is seeking an  end-run around the statute of limitations or whether the fiduciary
17  duty claim is meant to be, in fact, such a claim and not a masquerading fraudulent transfer claim.
18  At the motion to dismiss stage, the Court must accept as true all factual allegations in the
19  complaint and must draw all reasonable inferences from those allegations, construing the
20  complaint in the light most favorable to the plaintiff.  *Pollard v. Geo Group, Inc.*, 607 F.3d 583,
21  585 n.3 (9th Cir. 2010); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir.
22  1993).  Plaintiff contends that the actionable conduct it seeks to challenge is the *expiration of* the
23  fraudulent transfer claim – not the fraudulent transfer claim itself.  Applying the *Bren* standard
24  of "the actual nature of the purported wrong," the Court does not find sufficient justification to
25  second-guess Plaintiff's allegations when viewing the Complaint with some deference towards
26  the Plaintiff.  Plaintiff's allegations are plausible.
27         Further, the *Bren* plaintiff sought to stack up two fiduciary duty claims, while Plaintiff's
28  fiduciary duty claim is predicated on the expiration of a different type of claim.  Such stacking

might have disinclined the Delaware court from allowing the claim, given the potential ramifications of "effectively doubl[ing] the statute of limitations for breaches of fiduciary duty to creditors from three years to six." *Bren*, at *4.  There, the plaintiff alleged that the general partner owed a fiduciary duty to preserve and pursue whatever non-operating assets the partnership had. *Id*.  One of these assets was "a claim against Stroud and Beck . . . *for breach of fiduciary duty* in connection with the [1998 transaction]." *Id.* (emphasis added).  The *Bren* plaintiff argued that the General Partner breached its fiduciary duty by failing to bring the fiduciary duty claim before it expired. *Id*.  The *Bren* court didn't like the results of this argument and rejected "[plaintiff's] argument that the statute of limitations runs from the time that a fiduciary duty is owed to a particular plaintiff rather than from the time of the harm to the entity." *Id*.

Here, as noted, the claim underlying the fiduciary duty claim is not another fiduciary duty claim.  And Plaintiff contends that the time of the harm to the entity was in 2008 when the fraudulent transfer claim expired, which the *Bren* court agrees is the correct time for such a claim to begin.  Further, the Court notes that *Bren* is but a single case with distinguishable and sometimes foggy facts.

At this stage, the Court declines to second-guess the intention behind Plaintiff's Claim 12, and declines to dismiss Claim 12 based on *Bren*.  The breach and harm alleged occurred in 2008, and the Court finds that Claim 12 is not barred by the statute of limitations.

Defendants' Motion to dismiss the Claim 12 on the basis of statute of limitations is DENIED.  The Court now considers Defendants' other arguments why Claim 12 should be dismissed.

### 3.2    Other Grounds

Defendants state that Plaintiff's Claim 12 is based on the fact that the 2008 Directors should have filed for bankruptcy by May 18, 2008, which was the expiration date of the fraudulent transfer claims relating to the 2004 Recapitalization.  The failure to do so, they argue,

was the alleged breach of their fiduciary duty.  Defendants argue that Claim 12 should be dismissed because there is no affirmative duty to file for bankruptcy.  In addition, Defendants offer four further arguments supporting dismissal of this claim: (1) Plaintiff failed to allege the underlying fraudulent transfer claim was viable; (2) any decisions to pursue claims are subject to business judgment rule deference; (3) a waiver under 8 Del. C. § 102(b)(7) would bar this claim; and (4) there was no self-dealing by Defendants.

Defendants contend that when a claim for breach of fiduciary duty is based, as here, on a failure to act Plaintiff must allege facts showing that the directors intentionally failed to act in the face of a known duty to file for bankruptcy.  But Plaintiff counters that this misconstrues the nature of this claim.  The actual allegations of the Complaint, according to Plaintiff, are that the Directors failed "to protect the corporate enterprise and maximize value – including the failure to preserve or even become informed about valuable corporate assets."  (Opp'n at 12:5-6.)

The Court agrees with Plaintiff that Defendants is misconstruing the duty alleged in the Complaint.  It is sufficient for Plaintiff to rest this claim on a duty to act in the best interests of the corporation, which includes maximizing the value of the corporation and being informed of valuable assets.  Even after insolvency, "[t]he directors continue to have the task of attempting to maximize the economic value of the firm."  *Prod. Res. Grp., LLC v. NCT Grp., Inc*., 863 A.2d 772, 791 (Del. Ch. 2004).  Indeed, "[t]he maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying." *Id.* at 791, n.60.  The duty is not so well-defined as Defendants would like to argue and rather is a broad duty, with specifics that depend on the exact circumstances.  If the Court were to carve out very narrow and specific duties, this would undercut the purpose of an overall fiduciary duty.

Defendants next argue that Plaintiff has not sufficiently alleged that the underlying fraudulent transfer claim would even be viable.  As an example, Defendants point out that Plaintiff failed to allege how the Company "got no value in return" for the "approximately $1.024 billion that were paid out directly to the Hoiles Family, B/P and other financial advisors."

(Compl., ¶ 194.) And Defendants argue that "most significantly, the Complaint does not identify which entity made the cash payout to members of the Hoiles family and which entity received their stock . . . ." (Motion, 12:23-25.) But this is asking too much. The Ninth Circuit has very recently clarified that a plaintiff need only provide detail sufficient to give fair notice of the nature of the claim and sufficient to be plausible. *Starr v. Baca*, No. 09-55233, slip. op. 2251, 2276. Plaintiff has met the standard now articulated by the Ninth Circuit. The pleading standard, even after *Iqbal* and *Twombly*, is still Rule 8(a), and a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Plaintiff need not meet the heightened pleading specificity of Rule 9(b), for example, nor allege every possible fact. Rather, Plaintiff must "nudge[]" his claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. While Defendants are correct that there are more facts that Plaintiff could allege to support the underlying fraudulent transfer claim, there usually are more facts that could be alleged. The Court finds that the allegations supporting the fraudulent transfer claim are sufficient to support the breach of fiduciary duty claim – the actual claim alleged. If Defendants choose later to seek summary judgment, they may then provide additional facts and argue the significance of those facts.

Next, Defendants contend that the business judgment rule protects the Directors' decision not to file for bankruptcy on a particular date and to allow the fraudulent transfer claim to expire. But "[i]n the case of the duty of loyalty, the plaintiff [can prevail over the business judgment rule] by showing that board action was not undertaken in a good faith effort to further the stockholders' best interests, but for some personal reason, such as entrenchment." *In re Midway Games*, 428 B.R. at 318. A failure to act in good faith may be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). The business judgment rule is only a presumption, which can be rebutted at the pleading stage by alleging facts showing breach of duty of care or loyalty or acts in bad fath. *Id.* at 52. Here, Plaintiff has alleged that the Defendants breached their fiduciary duties by acting for a purpose other than the best interests of the Company. The allegations are sufficient to overcome the

business judgment rule at the pleading stage, when the Court assumes that Plaintiff's allegations are true.

A related argument is Defendants' invocation of 8 Del. C. § 102(b)(7), which allows a waiver of negligence-based fiduciary duty claims. But a defense under § 102(b)(7) is not available when a plaintiff, as here, asserts a violation of the duty of loyalty or duty of good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 91, 92 (Del. 2001). As discussed previously, Plaintiff has sufficiently alleged a breach of the duties of loyalty and good faith. Thus, Defendants cannot find refuge in § 102(b)(7) against Claim 12. Because this argument also fails against Claim 13 and Claim 14, the Court need not address it further.

Defendants' final argument here is that the Complaint fails to allege self-dealing. Defendants cite *In re Coca-Cola Enters., Inc.*, for the rule that self-dealing occurs when a defendant "stood on both sides of the transaction and dictated its terms in a self-dealing way." *In re Coca-Cola Enters., Inc.*, C.A. No. 1927-CC, 2007 WL 3122370, at *4 (Del. Ch. Oct. 17, 2007). But self-dealing is not necessary for stating this claim. *See In re Midway Games*, 428 B.R. at 318. Thus, the Court need not consider whether Plaintiff's allegations of self-dealing by certain Directors is sufficient for this claim.

In sum, Defendants' challenges to Claim 12 fail. The Court therefore DENIES Defendants' Motion to Dismiss Claim 12.

**4.    CLAIM 13**

Defendants move to dismiss claim 13 – breach of fiduciary duty due to the Waiver Agreement – on the grounds that Delaware law doesn't support claims that a company should have filed for bankruptcy instead of a different course of action, and directors are not liable for decisions made to prolong a corporation's vitality. Defendants point out that, as stated in the Complaint, the Board considered various alternatives after the Company defaulted on its covenants in September 2008. (Compl., ¶¶ 69-74.) The business judgment rule, they argue,

should protect "risky strategies" even if in hindsight the chosen strategy was a losing one. *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 193 (Del. Ch. 2006).

Plaintiff argues that the duty here is "the duty to protect the corporation and not to dissipate corporate assets in transactions that are not designed to maximize the value of the Company." (Opp'n at 20:4-5.) The problem, as alleged by Plaintiff, was that Defendants preferred the interests of certain entities – the shareholders specifically and the lenders as a means to preferring the shareholders – over the interests of the corporation. After a corporation is insolvent, as discussed earlier, the residual beneficiaries are the creditors rather than the shareholders. But directors still owe a direct fiduciary duty to the corporation itself. So, "the true issue is whether the action was in the best interests of the entire corporate enterprise." (Opp'n at 20:21-22) (emphasis deleted). The "action" in this case was the Waiver Agreement.

As discussed in Section 3.2, the business judgment rule doesn't apply when Plaintiff has alleged bad faith, as Plaintiff has done here. Plaintiff alleges that the Waiver Agreement was "extremely high-risk and ill-advised" as the probability of recovery was "de minimus at best." (Compl., ¶ 78.) As alleged, the whole purpose of the Waiver Agreement was to "secure value for equity" and "placed the Company's assets at extraordinary risk for the sole benefit of shareholders." (*Id*., ¶¶ 79-80.) Therefore, Plaintiff alleges, Defendants breached their duty to the company by entering into the Waiver Agreement rather than filing for bankruptcy, because the Waiver Agreement was motivated by considerations other than the best result for the company. (*Id*. ¶ 208.) Plaintiff alleges that certain Directors knew that bankruptcy was necessary but also knew that bankruptcy would destroy the right of equity holders to recover any value. (*Id*. ¶ 208.)

Defendants argue that the Waiver Agreement actually benefitted the shareholders, the lenders, *and the Company*, and that the only party it didn't benefit was the unsecured creditors. But a question of whether or not the Waiver Agreement benefitted the Company can't be answered at this stage. As the Court noted previously, factual issues such as that could perhaps be addressed through a motion for summary judgment but are beyond the scope of this Motion.

17

For now, Plaintiff has sufficiently alleged that the Company "and its creditors, as the Company's beneficial owners, gained nothing from the Waiver." (Compl., ¶ 84.)

Plaintiff has stated a claim for breach of fiduciary duty for entering into the Waiver Agreement. Therefore, Defendants' Motion to dismiss claim 13 is DENIED.

**5.    CLAIM 14**

Defendants argue that claim 14 – breach of fiduciary duty due to failure to preserve the Company's preferential transfer causes of action – should be dismissed because decisions about timing of bankruptcy filing is subject to the business judgment rule and directors do not have a duty to file for bankruptcy.

Plaintiff alleges in the Complaint that the 2009 Directors had a duty to act for the benefit of the Company and its creditors by filing for bankruptcy. (Compl. ¶ 220.) By the summer of 2009, Plaintiff argues, "the Company knew it would be filing bankruptcy. The only question was when." (Opp'n at 25:18-19.) Plaintiff alleges that the Directors wanted to obtain some value for their own equity and that motivated their decision to delay filing and that the Directors thus breached their duty to act in the best interests of the Company. (Compl. ¶¶ 220, 221.)

As discussed in Section 3.2, business judgment deference does not offer blanket protection when there are allegations of bad faith. And as discussed, Defendants' argument that there is no duty to file for bankruptcy misconstrues Plaintiff's claim. The general fiduciary duty alleged by Plaintiff is that the Directors must act in the best interests of the Company. Plaintiff has alleged an act – delaying bankruptcy to "further [the Directors'] and their constituencies' interest of negotiating with the Lenders for a recovery for out of the money shareholders" (*Id*. ¶ 221) – that breached the duty to act in the best interests of the Company. Despite Defendants' arguments that the bankruptcy delay only harmed the unsecured creditor group, Plaintiff has alleged that the expiration of the potential preferences harmed the Company itself. Because the recovered preferences would have gone first to the Company's bankruptcy estate and only then be distributed to the creditors, the Court agrees that Plaintiff has alleged harm to the Company

from the expiration of tens of millions of dollars of potential preferences. Plaintiff has stated a claim for breach of fiduciary duty for failure to preserve certain preference claims.

Thus, Defendants' Motion to dismiss Claim 14 is DENIED.

**6.    CLAIM 15**

Defendants argue that Claim 15 – breach of fiduciary duty due to payment of $3 million to JPMorgan – should be dismissed because Plaintiff has failed to state a claim for waste.

Plaintiff alleges that the $3 million payment to JPMorgan "constituted waste, rendered no value to the Company, and was paid only as a further concession to JPMorgan on an already-completed arrangement that impermissibly provided some recovery to out of the money equity holders." (Compl. ¶ 228.) Plaintiff alleges that this payment breached Directors' fiduciary duty to act in the best interests of the Company and to preserve its assets for the benefit of creditors once insolvent. (Compl. ¶ 228.)

Defendants argue that the standard for waste is very high. An act constitutes waste only if it is exceptionally one-sided, with an exchange of corporate assets for disproportionately small consideration beyond the range where any reasonable person would trade. *White v. Panic*, 783 A.2d 543, 554 (Del. 2001); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). "To be sure, there are outer limits, but they are confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Brehm*, 746 A.2d at 263.

Plaintiff argues that the $3 million Restructuring Fee to JPMorgan was "not required by the Plan Support Agreement or any other signed contract." (Opp'n at 33:2-4, citing Compl., ¶ 99.) Thus, Plaintiff contends, the payment of several million dollars for an already-completed contract constitutes waste.

The Court disagrees with Plaintiff. Plaintiff is attempting to separate out a final fee to JPMorgan from the rest of the transaction. If Plaintiff had alleged that JPMorgan did nothing at all, perhaps a fee of $3 million for no work might constitute waste. But here, Plaintiff alleges a whole transaction involving JPMorgan, at the end of which the Company paid an extra fee. A

reasonable person could pay a bonus fee to a financial institution for helping with a transaction, even if the fee wasn't necessary. Plaintiff has not alleged that the $3 million fee was irrational and unfounded. Instead, Plaintiff seems to disagreeing with the decision to pay an extra fee, but this does not rise to the level of corporate waste. Plaintiff has not alleged a claim for waste.

Thus, Defendants' Motion to dismiss Claim 15 is GRANTED with leave to amend.

**DISPOSITION**

Defendants' Motion to Dismiss is DENIED for Claim 4, 6, 7, 8, 12, 13, and 14. Defendants' Motion to Dismiss is GRANTED for Claim 15 with leave to amend. Any such amended complaint shall be filed and served within 14 days of this Order, and any amendments shall be directed only at Claim 15.

IT IS SO ORDERED.

DATED: February 22, 2011

_____
Andrew J. Guilford
United States District Judge